UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ANTHONY ROZELLE BANKS,                   )
                                         )
                    Petitioner,          )
                                         )
v.                                       )          Case No. 03-CV-0198-CVE-TLW
                                         )
RANDALL WORKMAN,[1] Warden,              )
Oklahoma State Penitentiary,             )
                                         )
                    Respondent.          )

OPINION AND ORDER

Now before the Court is petitioner Anthony Rozelle Banks's Petition for a Writ of Habeas

Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (Dkt. ## 10, 13).  Petitioner was

sentenced to death on November 17, 1999 and is an inmate on the State of Oklahoma's (the State)

death row.  Petitioner appears through appointed counsel and challenges his conviction and sentence

on 13 grounds.[2]

I.

Around 11:30 p.m. on June 6, 1979, the Tulsa Police Department (TPD) received a call from

Steve Travis stating that his wife, Sun Travis, had not returned home from work and he believed that

she may be missing.  Sun Travis worked from 3 p.m. to 11 p.m. at Bama Pie, and she lived with her

husband about a block from Bama Pie.  Steve Travis reported that he heard Sun Travis' vehicle pull

---

[1]     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the **Court Clerk** shall be
        directed to substitute Randall G. Workman for Mike Mullin as the party respondent.

[2]     Petitioner filed a petition for writ of habeas corpus (Dkt. # 10) asserting 12 grounds for relief
        and an amendment (Dkt. # 13) alleging an additional claim that State's method of execution,
        lethal injection, violates the Eighth Amendment to the United States Constitution.

into the parking lot of their apartment complex and he looked out a window facing the parking lot. She seemed to be driving unusually fast and did not pull into her usual parking spot, and Steve Travis saw another vehicle pull into the parking lot behind his wife's vehicle. He waited for several minutes and Sun Travis did not come into the apartment. He went out to the parking lot and noticed that the vehicle was not in the Travis' assigned parking space. The keys were in the ignition and the vehicle was still running, and Sun Travis had not turned off the lights. TPD Sergeant Curtis Thompson responded to Steve Travis' call and did not observe any signs of a struggle near Sun Travis' vehicle. However, Sun Travis was barely five feet tall and sat on a blanket or pillow while driving, and Thompson found a blanket in the parking lot near the vehicle. Thompson took a report concerning Steve Travis' statements.

On the morning of June 7, 1979, Harold Madewell, a Tulsa Public Schools employee, was driving a tractor on 36th Street North in Tulsa, Oklahoma and discovered the body of Sun Travis approximately 15 feet from the side of the road. Madewell notified the TPD and law enforcement officials began to arrive around 7:30 a.m. Investigators found that Sun Travis had been shot in the head at close range. Deputy Chief Medical Examiner Robert L. Hemphill performed an autopsy on Sun Travis' body and declared the cause of death to be a gunshot wound to the head. However, he determined that Sun Travis had been vaginally and anally raped before her death, and bruises on her body and face were caused before her death. Hemphill took samples of fluid from the victim's body and clothing using cotton swabs, and saved those samples for later testing by law enforcement agencies. Steve Travis fully cooperated with the investigation and he was ruled out as a suspect in his wife's death.

2

Investigators did not develop any other leads until November 1979.  Ron Shaffer, an assistant Tulsa County District Attorney, notified Fred Parke, a homicide detective for TPD assigned to the investigation, that Anthony Rozelle Banks notified Shaffer that he had information concerning Sun Travis' death, and Banks wished to use this information to bargain for a lesser sentence in another criminal case.  Banks gave a taped statement to Shaffer, Parke, and TPD Sergeant Roy Hunt.  Banks stated that he was at a gas station near 36th Street North and Peoria Ave in Tulsa when his friend, Allen Nelson, approached Banks and offered to give Banks gas money if he would drive Nelson around town.  Banks claimed that he purchased some beer and gasoline with the money Nelson gave him, and he drove Nelson to an apartment complex near 11th Street.  Banks stated that Nelson got out of the car after a vehicle pulled into the parking lot, and he came back to the car with an Asian woman.  Nelson allegedly told Banks to drive to the Apache Manor Apartments, and Nelson entered the apartment complex with the woman, while Banks stayed in the car to drink beer.  Nelson and the woman came out of the apartment complex about an hour later, but the woman was partially nude and Nelson was carrying some of her clothes.  Banks claimed that they were driving along 36th Street North when Nelson asked him to stop the car.  Nelson and the woman exited the vehicle.  Banks stated that Nelson shot the woman in the head with a firearm and she fell into a ditch.  Nelson re-entered the car and they continued driving.  Banks stated that he stopped the car near 27th Street North and Cincinnati Avenue, and Nelson disposed of the gun and the woman's clothes in a storm drain.  Banks and his attorney later accompanied Parke to the places described in his statement, and the locations included Sun Travis' apartment complex and the location where her body was found.

No charges were filed against Banks or Nelson following Banks' statement and the investigation was officially closed in 1981.  However, TPD's forensic laboratory began performing

3

deoxyribonucleic acid (DNA) testing in 1996, and the physical evidence in Sun Travis' murder investigation, including her clothing and swabs containing fluid samples, was still on file.  TPD obtained search warrants for Banks' and Nelsons' blood for comparative sampling with the evidence in Sun Travis' murder.  TPD forensic chemist Alan Keel extracted a DNA sample from a sperm stain on Sun Travis' pants and found four separate alleles that could be used for comparative DNA testing.  All four alleles were taken from sperm found within the stain.  The existence of four alleles meant that the sample contained the DNA of at least two people.  David Muniec, another forensic chemist for TPD, compared the sample extracted by Keel to Banks' and Nelson's DNA, and he found that the four alleles found in the sample on Sun Travis' clothing precisely matched Banks' and Nelson's DNA.  TPD later sent the same sample for independent testing to Cellmark Diagnostics (Cellmark), and Cellmark confirmed that Muniec's results were correct.

On August 6, 1997, Banks and Nelson were jointly charged by information with murder in the first degree.  The original information charged Banks and Nelson with committing the murder of Sun Travis with "malice aforethought," but did not charge them with felony murder.  The trial court found that Banks was indigent and appointed the Oklahoma Indigent Defense System to represent him.  The State requested several continuances of the preliminary hearing originally set for  January 27, 1998, and the preliminary hearing was reset for May 12, 1998.  Before the preliminary hearing, Banks filed a motion to suppress his November 1979 statement, as well as motions for discovery.  See O.R., Vol I, at 98-103.[3]

---

[3]     The trial court's original record was presented in two volumes and shall be cited as (O.R., Vol. ---, at ----).

The preliminary hearing began on May 12, 1998 and the State presented one witness.  The preliminary hearing was continued to May 26, 1998.  On May 26, 1998, the State announced that it would be filing an amended information adding felony murder allegations against Banks and Nelson.  The State presented five witnesses on May 26 and 27, 1998. Defense attorneys challenged the admissibility of statements made by Banks and Nelson to Parke, and it was necessary to reconvene the preliminary hearing on June 5, 1998 to complete Parke's testimony.  The State intended to offer Parke's testimony as to statements allegedly made by Banks in November 1979 and statements made by Nelson in April or May 1998.  The state court suppressed Nelson's statements to Parke, because the statements were made during plea negotiations.  However, the trial court permitted Parke to testify about Banks' 1979 statements.  Following Parke's testimony, the state court found that there was probable cause to charge Banks and Nelson with murder in the first degree.

The State filed a bill of particulars on June 25, 1998 notifying Banks that it would seek the death penalty against him and cited four aggravating circumstances: (1) the murder of Sun Travis was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding arrest; (3) Banks presented a continuing threat to society; and (4) Banks had previously been convicted of multiple crimes of violence.  O.R., Vol II, at 261-62.  The State did not file a bill of particulars against Nelson, and it did not seek the death penalty against him.  Banks filed numerous pretrial motions, including a motion to quash the search warrant for his blood sample[4] and a motion to sever the charges against Banks and Nelson.  The trial court granted the motion to sever,

---

[4]     The state court did not rule on the motion to quash the search warrant for Banks' blood sample until the third day of trial. Tr. Trans. at 344.

because each defendant made statements incriminating his co-defendant and the co-defendant would not likely be available for cross-examination.  On August 27, 1999, the State filed an amended information charging Banks with murder in the first degree under a felony murder theory and, in the alternative, under a "malice aforethought" theory.  O.R., Vol. II, at 259-60.

Banks' jury trial began on September 20, 1999.  Attorneys for the State and for Banks made opening statements, and the first witness for the State was Steve Travis.  Steve Travis testified that Sun Travis worked at Bama Pie and ordinarily returned home around 11:30 p.m.  He heard the car pull into the parking lot of the apartment complex.  He saw another car closely following Sun Travis' car and noticed that Sun Travis was driving faster than usual.  Tr. Trans. at 365-66.  Sun Travis did not park in the assigned parking space but, instead, parked on the opposite side of the parking lot.  He testified that many college students lived in the apartment complex, and he was not worried by what he had observed.  Steve Travis put dinner on the table and waited for Sun Travis to enter the apartment, but she did not come.  Id. at 369.  He looked out the window and saw that Sun Travis' car was unoccupied and the dome light was on.  He went out to the car.  The door was open and the pillow Sun Travis used when driving was in the parking lot.  Id. at 369-70.  Steve Travis called the police and a TPD officer arrived about 20 minutes later.  On cross-examination, Steve Travis testified that he did not clearly see the occupants of the vehicle following Sun Travis' car, and he could not identify the occupants or the number of occupants.  Id. at 384-85.  He also testified that the door of Sun Travis' vehicle was open and the headlights were left on, and the police officer who responded to the call observed enough suspicious circumstances that he called for another officer.  Id. at 390-91.

Thompson testified that he responded to Steve Travis' call.  Steve Travis appeared to be nervous, but Thompson found that his concern for Sun Travis was sincere.  Id. at 405.  Thompson did not observe any signs suggesting that Sun Travis was forcibly taken from her vehicle, but Thompson stated that Steve Travis had already turned off the lights and picked up the pillow or blanket from the parking lot.  Thompson noted in his written reports that Steve Travis was nervous and that he made an "unusual" observation of fingerprints on the driver's side window, but he did not find anything suspicious about Steve Travis' demeanor.  Id. at 410-11.  Madewell testified about his discovery of Sun Travis' body on June 7, 1979.  Id. at 411-21.  Former TPD Officers George H. Gregory and Jack Putnam described the physical evidence they picked up from the medical examiner's office and the safekeeping and custody of the evidence after they took control of it.  Id. at 427-43, 495-98.

Robert L. Hemphill worked for the Officer of the Chief Medical Examiner and conducted the autopsy of Sun Travis.  Id. at 449.  He gathered physical evidence from the victim's body, including swabs of fluid taken from the victim's vagina and anus.  Id. at 451.  The swabs were stored in glass tubes and marked to show the location on the victim's body from which the fluid was taken.  Id. at 455.  The swabs were picked up by Putnam, and the other physical evidence was picked up by Gregory.  Id. at 456.  Hemphill found that the cause of Sun Travis' death was a gunshot to the head from no more than a few inches away, because the presence of gunpowder near the wound showed that the gun was close to the victim's head when the shot was fired.  Id. at 461.  He also found several bruises or contusions on Sun Travis' face, and these injuries were caused before she died.  Id. at 463.  He could not declare the time of death with any certainty, except to note that Sun Travis died between 11:30 p.m. and 6:45 a.m. the following day.  Id. at 464-66.  On cross-

examination, Hemphill acknowledged that the did not find any internal or external injury to the victim's vagina or anus. Id. at 477-79.  He also could not determine what time the bruising on the victim's face occurred.  Id. at 483.

Susan Land, a former forensic chemist for the Oklahoma State Bureau of Investigation (OSBI), testified that she tested the swabs of fluid taken from the Sun Travis' body for spermatozoa. She found spermatozoa on the swab taken from the victim's vagina.  Id. at 505.  However, DNA testing was not available in 1979, and she simply detected the presence of spermatozoa.  She returned the swabs to TPD after completing her testing.  Rebecca Rush was a forensic chemist for TPD in 1979.  She examined the victim's pants for foreign hairs or fibers, and retained any such objects for later testing.  She placed the pants in a paper sack, and marked the sack with a property number for Sun Travis' case.  Id. at 517.

Parke testified that he obtained a blood sample from petitioner on December 31, 1996, and he retained exclusive control of the sample until he turned it into the TPD property room.  Id. at 528-29.  Parke took a blood sample from Nelson on December 17, 1996.  The State attempted to call Carla Noziglia, the director of the forensic laboratory for TPD, but defense counsel objected to her testimony because the State failed to endorse Noziglia as a witness before trial.

On the second day of trial, the State announced that it would call Banks' brother, Walter Banks, to testify.  Walter Banks informed the trial judge that he would not testify, even though the trial judge found that Walter Banks did not have a valid Fifth Amendment privilege.  Id. at 548-49. The trial judge threatened to hold Walter Banks in contempt for refusing to testify, and Walter Banks stated:

> I don't know anything.  I've told these attorneys quite a few times that I do not know
> anything about this case, and I'm not going to testify.  I mean, I'm incarcerated.  I'm

doing a life sentence in prison.  And I'm not going back to prison for testifying against my brother in the case, because I don't know anything about the case.  I've told these attorneys numerous times, or the district attorney's office, that I don't have -- I have no idea about this case at all.  But yet they continue to subpoena me . . . .

Tr. Trans. at 550.  Even though it was clear that Walter Banks would not answer any questions, the trial judge permitted the State to call Walter Banks as a witness to "refresh his recollection."  Id. at 552-53.  Defense counsel objected to Walter Bank's proposed testimony, because petitioner would have no way to cross-examine Walter Banks and rebut any adverse inferences from the State's direct examination.  Id. at 555.  The trial judge overruled petitioner's objections and permitted the State to call Walter Banks as a witness.  Walter Banks refused to answer any questions, but the prosecutor's questions created a clear impression that petitioner confessed to Walter Banks that he murdered Sun Travis.[5]

The State called Julie Kempton, a forensic chemist formerly employed by Cellmark, who conducted comparative DNA testing on the evidence in petitioner's case.  The State sent test tubes containing DNA extracted from Sun Travis' body and clothing, Nelson's and petitioner's blood samples, and hairs recovered from Sun Travis' body.  Kempton reviewed DNA samples that had already been extracted by scientists at TPD's forensic laboratory and compared those samples to determine if the DNA found on Sun Travis matched Nelson or petitioner.  Id. at 594.  Defense counsel objected to continued direct examination of Kempton until the State established that the DNA extraction was performed in a reliable manner, and the State agreed to defer the remainder of Kempton's testimony until this foundation had been laid.  Id. at 600-02.

---

[5]     The Court provides a more extensive summary of Walter Banks' testimony when considering petitioner's argument that his trial was rendered fundamentally unfair by adverse inferences created by Walter Banks' testimony.  See infra at III (Ground One).

The State recalled Parke to testify about his investigation of the murder and petitioner's statements to law enforcement officials in 1979. Parke testified that he did not initially find any leads from his interviews of Sun Travis' friends and co-workers. Id. at 620. However, Parke was contacted by Shaffer, and was informed that petitioner wished to make a statement about the murder. Petitioner gave a taped statement concerning the murder and accompanied police to the locations described in his statement. Id. at 623. Petitioner claimed that Nelson approached him and asked petitioner to drive Nelson to an apartment complex. Nelson allegedly saw Sun Travis' vehicle pull into the parking lot of the apartment complex, and came back to petitioner's vehicle with Sun Travis. Petitioner assumed that Sun Travis was Nelson's girlfriend, and drove them to the Apache Manor Apartments. Id. at 624. Petitioner claimed that Nelson and Sun Travis went into the apartment complex, and he waited in the car and drank beer. When Nelson and Sun Travis returned to car, Sun Travis was partially nude and was carrying her clothes. Nelson asked petitioner to drive along 36th Street North in Tulsa. While they driving on 36th Street North, petitioner claimed that Nelson asked him to stop the car. Nelson took Sun Travis out of the car and shot her in the head. Petitioner assisted Nelson with disposal of Sun Travis' clothes and Nelson's gun. Parke testified that petitioner accurately identified Sun Travis' apartment complex and the location where her body was found. Id. at 626.

Hunt testified that he supervised the investigation into Sun Travis' murder, and he sent three detectives, including Parke, to investigate the murder scene. Id. at 641-42. Homicide detectives did not gather any useful leads from June to October 1979. Shaffer told Hunt that an inmate in county jail wanted to make a statement about Sun Travis' murder, and Hunt accompanied Parke when

10

petitioner made a statement to police. Id. at 644. Petitioner's statement did not provide a sufficient basis to bring charges against any person and the case was put on inactive status. Id. at 646.

The State recalled Noziglia to testify about the preparation of evidence for comparative DNA testing. Noziglia selected Cellmark to perform outside DNA testing due to Cellmark's reputation, and she prepared the package that was sent to Cellmark for testing. Id. at 657-58. However, TPD forensic chemists Keel and Muniec actually extracted the DNA from the evidence. Id. at 660. Noziglia explained how DNA is extracted from a sperm sample. Id. at 664-65. Keel testified that he began working for TPD in 1996, and his job was to establish an in-house laboratory for DNA testing. Id. at 668. Keel described the type of DNA testing used in petitioner's case, polymerase chain reaction (PCR) testing, which amplifies a small amount of DNA to permit comparative testing of a small or degraded DNA sample. Id. at 672-78. In 1996, Parke contacted Keel about the possibility of using DNA testing on the evidence from Sun Travis' murder, and Keel reviewed the evidence to determine if it would be possible to conduct DNA testing. Id. at 681. Keel collected evidence from the TPD property room on August 9, 1996. He located a stain on the crotch of Sun Travis' pants, and the stain tested positive for semen. He extracted a DNA sample from the semen stain, and amplified the DNA for a gene called D1S80. Keel also extracted DNA from the vaginal and anal swabs. Id. at 689. Keel examined the extracted DNA to determine what D1S80 alleles were present in the samples, but he did not perform comparative DNA testing. Id. at 701-02.

The State called Muniec at the beginning of the third day of trial. Muniec was a forensic DNA analyst for the Maine State Police crime laboratory, and he formerly worked as a criminalist at the TPD forensic laboratory. Id. at 736. Muniec compared the DNA extracted by Keel to the blood samples taken from petitioner and Nelson, and the sample taken from the crotch of Sun

11

Travis' jeans contained DNA consistent with petitioner's and Nelson's DNA samples. Id. at 779.

He performed new DNA testing in 1998 using his own cuttings and DNA extractions, and reached

the same results.  He noticed that the peaks, or intensity of each allele, were consistent with

petitioner's and Nelson's DNA samples, because the darker or more intense bands both matched

petitioner's DNA sample, while the lighter bands both matched Nelson's DNA sample. Id. at 784-

93.  Julie Kempton also testified that she performed PCR testing on the same samples, and the

pattern she found was consistent with a mixture of petitioner's and Nelson's DNA. Id. at 760.  Her

work was reviewed by another scientist at Cellmark, and the review process confirmed that her

results were accurate. Id. at 762.

        The State rested following Muniec's and Kempton's testimony, and petitioner moved for a

judgment of acquittal.  The trial judge overruled petitioner's motion. Id. at 814-15.  Petitioner did

not call any witnesses and rested his case.  At the jury instruction conference, defense counsel

requested that the trial judge submit separate verdict forms to the jury on each legal theory argued

by the State, but the trial judge denied petitioner's request. Id. at 818.  The parties made their

closing arguments.  The State opened its closing argument by comparing the crime to a wild animal

that stalks its prey and chooses a helpless victim. Id. at 820.  The State argued that petitioner's

version of the events was refuted by circumstantial evidence suggesting that Sun Travis was

frightened from the moment that she pulled into the apartment parking lot, and argued that petitioner

could not have believed that Nelson was simply picking up his girlfriend. Id. at 822-23, 827.  The

State relied on the DNA evidence to show that petitioner participated in the rape and murder of Sun

Travis, and argued that petitioner's assertion that he was simply a bystander was not supported by

any evidence. Id. at 825.  Defense counsel argued that it was undisputed that Sun Travis was

murdered, but the State failed to prove that she was kidnapped or raped. Id. at 833-34. Defense counsel asserted that petitioner's 1979 statement to police was an accurate rendition of the events, and there was no evidence that petitioner participated in the abduction, rape, or murder of Sun Travis. Defense counsel argued that DNA evidence was generally unreliable and it failed to prove that petitioner participated in the murder of Sun Travis. Id. at 847-49. He also claimed that the State failed to compare the DNA samples taken from Sun Travis's body and clothing to Walter Banks' DNA and rule him out as a suspect. Id. at 851. The jury convicted petitioner of first-degree murder, and the trial judge scheduled the second phase of trial for the following week.

Before the second phase began, defense counsel argued that the State should be prohibited from requesting the continuing threat aggravating circumstance, because the evidence on this aggravating circumstance overlapped with the evidence for the prior violent felonies aggravating circumstance. Id. at 880-85. Petitioner was willing to stipulate to the prior violent felonies, and he argued that the State should not be permitted to get the details of his prior felonies into evidence by using the continuing threat aggravating circumstance. The trial judge denied petitioner's request. Petitioner stated that he would stipulate to his prior felonies for the prior violent felonies aggravating circumstance, and the trial judge reviewed with defendant which prior convictions would be used against him. Id. at 888-89. At the outset of the second phase, the State informed the jury that it would be relying on four alleged aggravating circumstances: (1) continuing threat to society; (2) prior violent felonies; (3) murder to avoid arrest or prosecution; and (4) the murder was especially heinous, atrocious, or cruel. Id. at 892.

The State's first witness was Charles Wayne Jordan, a TPD officer who investigated a robbery/murder at a Git-N-Go convenience store on April 11, 1978. Id. at 895. Jordan found the body of the clerk, David Fremin, behind the counter, and he determined that Fremin was murdered

13

with a gunshot to the head at close range.  Id. at 899.  The State offered into evidence a record of petitioner's guilty plea to the murder of Fremin.  Id. at 906.  Hemphill testified that the angle of the entry wound into Fremin's head suggested that Fremin was killed execution-style.  Id. at 911-13. Parke testified about a statement made by petitioner in November 1979, in which petitioner attempted to clear himself and his brother of any guilt for the Fremin murder.  Id. at 918.  In response to defense counsel's cross-examination, Parke explained that petitioner voluntarily approached police and made his statement concerning the Sun Travis murder to obtain a plea deal for a separate armed robbery charge.  Id. at 920.  The State offered certified copies of judgments and sentences showing that petitioner had been convicted of the following crimes:

- Robbery with a Firearm, CF-73-1322, Tulsa County District Court

- Robbery with a Firearm, CF-73-1323, Tulsa County District Court

- Second Degree Burglary after Former Felony Conviction, CF-79-1786, Tulsa County District Court.

- Robbery with a Firearm after Former Felony Conviction, CF-79-2872, Tulsa County District Court

- Murder in the First Degree, CF-79-3393, Tulsa County District Court

- Escape from a Penal Institution, CF-81-877, Tulsa County District Court

- Assault and Battery with a Dangerous Weapon, CF-81-877, Tulsa County District Court

- Assault and Battery with a Dangerous Weapon, CF-81-877, Tulsa County District Court

Id. at 927.  Mike Buckendorf, Sr., a former detective for the Tulsa County Sheriff's office, testified about an attempted prison escape by petitioner and three other inmates in March 1981.  The inmates made a knife using a piece of steel, and threatened to kill a corrections officer guarding their section of the prison.  Id. at 932.  They took the correction officer's key and moved into other areas of the

14

prison.  They encountered a second corrections officer, and threatened to kill him as well.  The second officer resisted the inmates, and the inmates beat him with a makeshift club, made with a tube sock and a large lock, before retreating to their cell block.  Id. at 933.  Petitioner was charged with escape and assault with a deadly weapon as a result of the incident, and a report prepared by one of the correction officers shortly after the escape attempt identified petitioner as the inmate wielding the makeshift knife.

Richard Thomas, a TPD officer formerly assigned to the K-9 division, testified about a burglary committed by petitioner and an accomplice.  Id. at 944.  Petitioner attempted to steal at least ten, and perhaps as many as 15, firearms, but Thomas arrested petitioner before he could escape.  Stephen Travis read a victim impact statement to the jury about the effect of Sun Travis' murder on his life, but the trial judge modified the statement as requested by defense counsel.  Id. at 951-55.  Tracy Foster, petitioner's ex-wife, testified on behalf of the State.  In April 1978, petitioner and Walter Banks left Walter Banks' apartment around 3:00 a.m., and returned later that night.  Petitioner told Foster that "he done stole for [her], and he done robbed, and he'd beat people for [her] and he'd even killed for [her]."  Id. at 959.  Petitioner admitted to Foster that he robbed a Git-N-Go convenience store and killed the clerk because the clerk could identify him.  Id. at 960.  He also told Foster that "dead men tell no tales."  Id. at 961.  The State rested and petitioner asked the Court to remove death as a sentencing option due the insufficiency of the evidence to support a death sentence.  Id. at 964.  The Court overruled the motion and declined to dismiss any of the aggravating circumstances.  Id.

Petitioner called his mother, Maureen Banks, to testify about the conditions of his upbringing.  Maureen Banks testified that petitioner's father was physically and emotionally abusive, and petitioner's father kicked him out of the house when petitioner was 15 or 16 years old.

15

Id. at 971.  Petitioner's father, Walter T. Banks, Sr., described the physical abuse in some detail.

Id. at 972-74.   In particular, petitioner's father recalled an incident when he placed a pistol to

petitioner's head and threatened to kill him for breaking a disciplinary rule.  Id. at 976.  He had not

seen petitioner in about 20 years but had spoken to petitioner on the phone, and believed that

petitioner had changed for the better after becoming a Christian.  Id. at 977.  Charles Story, a prison

minister, testified that he first met petitioner in 1988 and noticed positive changes in petitioner's

behavior and demeanor over the next several years.   Id. at 979.   He attributed these changes to

petitioner's conversion to Christianity in 1990. Id. at 979-81.  Fred Cook, a unit manager at the state

penitentiary in McAlester, Oklahoma, testified that petitioner was successful in a structured, prison

environment, and petitioner had been given additional freedom and responsibility due to his good

behavior in prison.  Id. at 988-89.  On cross-examination, Cook acknowledged that petitioner's file

indicated that petitioner admitted to a 1970 juvenile murder conviction that was not otherwise listed

on petitioner's criminal history.  Id. at 999.  Steve Waldvogel provided culinary skills training to

inmates at state prisons, and petitioner enrolled in a class around 1994.  Id. at 1001-02.  Waldvogel

testified that petitioner did well in the class and was given additional responsibilities due to his

success in the classroom environment.  Id. at 1006.

Petitioner's key witness in his mitigation case was Phillip J. Murphy, a licensed clinical

psychologist retained to examine petitioner.  Id. at 1008.  Murphy first examined petitioner in 1993,

and conducted a battery of tests designed to identify psychological disorders and organic brain

injuries.  Id. at 1011-12.  Murphy made two findings based on this testing.  First, he determined that

petitioner suffered from a right frontal brain anomaly, and he reached this diagnosis based on

petitioner's inability to interpret social cues or make sound judgments.  Id. at 1014-15.  Second, he

found that petitioner had "paranoid defenses" to stressful situations, and was extremely distrustful

16

of other people.  Id. at 1014.  Murphy retested petitioner in April 1999, and found that the two

psychological conditions he noted in 1993 were no longer present.  Id. at 1017.  Murphy did not find

that petitioner suffered from a personality disorder in 1993 or 1999, but he reviewed records of

psychological testing from 1980 suggesting that petitioner was a psychopath or had an antisocial

personality.  Id. at 1018.  According to Murphy, this meant that petitioner wholly or partially lacked

a conscience or other mechanisms for feeling guilt and anxiety, and he found that it was unusual for

this type of disorder to improve over time.  Id. at 1019-23.  Psychopaths tend to come from homes

with no male role model or a violent and abusive male role model, and Murphy found that

petitioner's background was consistent with this general rule.  Id. at 1029.  On cross examination,

it became clear that Murphy did not know the details of the Sun Travis murder, because he believed

that both murder charges against petitioner stemmed from convenience store robberies.  Id. at 1034.

The State also asked Murphy to review the report of the 1980 testing, and the report clearly stated

that petitioner showed "no signs of gross psychotic pathology."  Id. at 1046.  On redirect, defense

counsel attempted to show that this statement was taken out of context, and other findings in the

1980 report supported Murphy's conclusion that petitioner was a psychopath in 1980.  Id. at 1049-

50.

Wayne Shaw was petitioner's case manager in 1997 and he reviewed petitioner's field file

when he became petitioner's case manager.  The field file contained a complete description of

petitioner's criminal history, disciplinary infractions, and periodic reviews in prison, and the file

showed that petitioner had not been a disciplinary problem.  Id. at 1064.  When petitioner was

transferred to Shaw's facility, he immediately requested a job until he qualified for vocational

training.  Id. at 1069.  Shaw was petitioner's case manager for about four months, and acknowledged

that death row inmates tend to have fewer disciplinary problems because they are given fewer

freedoms. Id. at 1072.  Petitioner's field file also showed that he may have been involved in a prison

riot in 1974 and an attempted escape in 1981.  Id. at 1073-74.

Petitioner rested his mitigation case and the parties made second stage closing arguments.

The State argued that petitioner failed to come forward to accept responsibility for his conduct and,

after the second such statement, the trial judge admonished the jury to disregard the second

statement only.  Id. at 1081.  The State relied on a demonstrative exhibit displaying petitioner's

criminal history and the exhibit was called the "trail of terror."  Id. at 1082.  The trial judge allowed

the State to use the exhibit over defense counsel's objection to the exhibit and motion for mistrial.

Id. at 1082-83.  The State's closing argument focused on the violent nature of petitioner's criminal

history and facts establishing that petitioner raped and murdered Sun Travis.  The State argued that

petitioner's religious conversion and his alleged psychopathic disorder did not lessen the severity

of his conduct or mitigate his eligibility for the death penalty.  Id. at 1087.  Defense counsel argued

that petitioner had become a different person due to his religious conversion, and he had shown that

he could do well in a structured environment.  Id. at 1095-99.  The jury found three of the

aggravating circumstances beyond a reasonable doubt and recommended a death sentence.[6]  Id. at

1118.  Petitioner was sentenced on October 28, 1999, and the judgment and sentence was entered

on November 17, 1999.

Banks filed a direct appeal of his conviction and sentence to the Oklahoma Court of Criminal

Appeals (OCCA) in Case No. F-99-1483, identifying nineteen (19) propositions of error:

Proposition 1:  The evidence presented at trial was insufficient to support
Banks' conviction for first degree murder and therefore

---

[6]    The jury found beyond a reasonable doubt that petitioner had committed prior violent
felonies, murdered Sun Travis to avoid arrest or prosecution, and the murder was especially
heinous, atrocious, or cruel.  Id. at 1118.

Banks' conviction violated the Due Process Clause of the 14th Amendment of the United States Constitution and the Corresponding Provisions of the Oklahoma Constitution.

Proposition 2:    The trial court committed reversible error in overruling Banks' motion to quash the search warrant and suppress the evidence in violation of the Fourth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 3:    The Trial Court erred in allowing the prosecutor's illustration entitled Trail of Terror in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 4:    The prosecutor improperly introduced evidence of other crimes to the jury in the guilt-innocence first stage of Banks' trial in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 5:    Banks received ineffective assistance of trial counsel, therefore his conviction and sentence must be reversed in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 6:    The trial court committed reversible error when the court allowed the amended information alleging malice aforethought in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 7:    Prosecutor [sic] misconduct in closing arguments denied Banks his right to a fair trial in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 8:    The trial court committed reversible error in allowing the State to build its case from inferences the State obtained from witness Walter Banks when he claimed his Fifth Amendment privilege.

Proposition 9:    The trial court erred in allowing the jury to sentence Banks to death without having to determine Banks' actual culpability

19

in relation to the charge of first degree felony murder, therefore Banks' death sentence is grossly unfair and unreliable under both the State and federal constitution.

Proposition 10:          The trial court erred in failing to give separate verdict forms on the two theories of first degree murder: felony murder and malice aforethought murder, which rendered Banks' trial fundamentally unfair and unreliable, and violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Proposition 11:          The trial court erred in overruling Banks' motion to quash the Bill of Particulars and declare death penalty unconstitutional and allowing the jury to sentence Banks to death in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 12:          The previously adjudicated issue of the constitutionality of the death penalty scheme violated Banks' constitutional rights to a fair trial and subjected him to the death penalty in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article 2, §§ 7, 9, 20 and 21 of the Oklahoma Constitution.

Proposition 13:          The trial court erred in overruling Banks' motion to strike "previous felony" aggravating circumstances as void on its face, or in the alternative to grant a Brewer hearing in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 14:          The trial court erred in overruling Banks' motion to strike aggravating circumstance "murder to avoid arrest" for insufficient evidence and Banks was wrongly sentenced to death in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution.

Proposition 15:          The trial court committed reversible error when the trial court overruled Banks' motion to strike the aggravating circumstance "heinous, atrocious, or cruel" for insufficient evidence and Banks was wrongly sentenced to death and; there was insufficient evidence to support the jury's findings of the aggravating circumstance of heinous, atrocious, or cruel in violation of the Sixth, Eighth and Fourteenth

|  |  |  |
|---|---|---|
|  | Amendments of the United States Constitution and the Oklahoma Constitution. |

| Proposition 16: | The death sentence Banks received violates both the State and United States Constitutions because the mitigating factors proven during the second stage outweighed evidence of aggravation introduced by the State. |
|---|---|

| Proposition 17: | Pursuant [sic] Okla. Stat. tit, 21 § 701.13(C)(1) (1991), mandatory sentence review, Banks' sentence of death must be vacated because the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, therefore Banks' sentence of death is in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and the Oklahoma Constitution. |
|---|---|

| Proposition 18: | The Eighth Amendment to the United States Constitution and Article II, § 9 of the Oklahoma Constitution would be violated if Banks' sentence of death is carried out. |
|---|---|

| Proposition 19: | The trial errors complained of herein cumulatively denied Banks' right to a fair trial under the United States and Oklahoma Constitutions and therefore, Banks' conviction and sentence must be reversed. |
|---|---|

Appellant's Brief at ii-vii, Case no. F-99-1483 (Okla. Crim. App.).  The OCCA affirmed Banks'

conviction and sentence on February 21, 2002.  Banks v. State, 43 P.3d 390 (Okla. Crim. App.

2002).  The OCCA determined that Walter Banks should not have been permitted to take the witness

stand and the prosecutor improperly commented on Banks' right to remain silent, but neither error

affected the outcome of the proceedings.

Banks filed a motion for post-conviction relief in the OCCA, case number PCD 2001-1533,

asserting four grounds for relief:

| Proposition I: | [Petitioner] received inadequate assistance of counsel from both trial and direct review counsel's failure to investigate and adequately challenge the State's evidence in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. |
|---|---|

Proposition II:      [Petitioner's] state and federal constitutional rights to a jury trial were violated by the failure to instruct the jury that it must find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. Because the weighing determination is a factual determination which authorizes the sentencer to increase the punishment for murder above the statutory maximum, the Oklahoma Constitution and the Sixth and Fourteenth Amendments to the federal constitution requires that this determination by made by a jury and must be proved beyond a reasonable doubt. Counsel's failure to raise this claim in prior proceedings violated [petitioner's] right to effective assistance of counsel.

Proposition III:     Prosecutorial conduct and comments exceeded the latitude which is permissible, becoming so rampant that [petitioner's] right to due process and constitutional guarantees under the Sixth, Eighth and Fourteenth Amendments were violated. Trial counsel's failure to object to the numerous instances of misconduct resulted in [petitioner's] being denied effective assistance of counsel at trial. The failure to fully advocate the error on direct review denied [petitioner] the effective assistance of counsel on direct review of his conviction and sentence.

Proposition IV:     The accumulation of errors which permeated [petitioner's] trial violated his rights to due process of law under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Original Application for Post-Conviction Relief, Case no. PCD 2001-1533 (Okla. Crim. App.). On May 7, 2002, the OCCA denied Banks' motion for post-conviction relief in an unpublished order. The OCCA found that each claim was properly raised in a motion for post-conviction relief, but denied relief on the merits of the claims.

Petitioner initiated the instant habeas corpus proceeding on March 24, 2003. See Dkt. # 1. In his petition for writ of habeas corpus (Dkt. # 10), filed on October 1, 2003, petitioner identifies the following twelve (12) grounds for relief:

Ground 1:     The trial court violated [petitioner's] right to confrontation and a fair trial as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by allowing the State to call Walter Banks as a witness after he made clear in chambers he had no knowledge of the Travis homicide and would refuse to answer questions regarding the matter.

Ground 2:     Evidence of unrelated crimes admitted at trial denied [petitioner] a fair trial under the Sixth, Eighth, and Fourteenth Amendments.

Ground 3:     The prosecution's conduct in both stages of the trial denied [petitioner] a fair trial and a fair sentencing hearing in violation of the Sixth, Eighth, and Fourteenth Amendments.

Ground 4:     The prosecutor suppressed favorable information material to both stages of trial and engaged in false and misleading argument in violation of the Sixth, Eighth, and Fourteenth Amendments.

Ground 5:     The defense psychologist was noticeably intoxicated and severely impaired when he testified so that he was not functioning as a competent expert in violation of the Eighth and Fourteenth Amendments; trial counsel did not take steps to preclude the display of an intoxicated and consequently ineffectual expert before the jury and appellate counsel failed to raise these issues in violation of the Sixth and Fourteenth Amendments.

Ground 6:     [Petitioner] was sentenced to death without the prerequisite factual findings essential to the jury's authority to impose the death penalty being made beyond a reasonable doubt, all as is required by the Sixth, Eighth, and Fourteenth Amendments.

Ground 7:     Material misrepresentations and omissions rendered the search warrant in [petitioner's] case invalid for lack of probable cause. The unconstitutional search and DNA obtained as a result of the unconstitutional search should have been suppressed.

Ground 8:     The state of Oklahoma failed to present sufficient evidence to prove [petitioner's] guilt beyond a reasonable doubt in violation of the Sixth, Eighth, and Fourteenth Amendments.

Ground 9:     [Petitioner] was denied the effective assistance of counsel guaranteed by the Sixth, Eighth, and Fourteenth Amendments in both stages of trial.

Ground 10:     The trial court's failure to strike the murder to avoid arrest aggravating circumstance for insufficient evidence resulted in [petitioner] being sentenced to death in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Ground 11:     Oklahoma's use of the especially heinous, atrocious, or cruel aggravating circumstance in this case, in particular the failure to assess correctly the sufficiency of the evidence, violated the Sixth, Eighth, and Fourteenth Amendments and warrants habeas corpus relief.

Ground 12:     The accumulation of error in these proceedings demonstrates [petitioner] was denied his fundamental right to a fair trial, the right to be free from cruel and unusual punishment, and the right to due process of law.

Respondent filed a response asking the Court to deny each ground for relief. Dkt. # 18. Petitioner filed a reply in support of his petition for a writ of habeas corpus. Dkt. # 29. Petitioner also filed an amendment to his petition for writ of habeas corpus alleging a thirteenth ground for relief:

Ground 13:     The lethal injection of [petitioner] under the protocols currently in force in Oklahoma and any similar protocols violates the Eighth and Fourteenth Amendment as does Oklahoma's procedures for devising said protocols.

Dkt. # 13, at 2.

After his petition for writ of habeas corpus had been filed, petitioner filed a "successor" motion for post-conviction relief in the OCCA raising three grounds for relief:

Proposition I:     The district attorney failed in its continuing obligation to turn over to [petitioner's] defense a potentially exculpatory statement made by [petitioner's] codefendant, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. In the alternative, former counsel rendered ineffective assistance for failing to obtain and present the withheld evidence.

Proposition II:     The defense psychologist was noticeably intoxicated as he testified, thereby depriving [petitioner] of expert assistance guaranteed under the Eighth and Fourteenth Amendments of the United States Constitution; Even though defense counsel

24

and the trial judge both noticed this intoxication, neither did anything to prevent the drunken testimony from being given and appellate counsel failed to raise these issues, in violation of the Sixth and Fourteenth Amendments to the Constitution.

Proposition III:    The execution of [petitioner] under Oklahoma's protocols for lethal injection violates the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and the Oklahoma Constitution.

Successor Application for Post Conviction Relief, Case no. PCD 2003-1222 (OCCA). On February 12, 2004, the OCCA issued an unpublished order denying Proposition I on the merits and finding Propositions II and III procedurally barred.

## II.

The following general considerations and standard of review apply to each of petitioner's claims for relief under § 2254:

Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b)(1)(A); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement).  In every habeas case, the Court must first consider exhaustion. Harris, 15 F.3d at 1554. "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles of comity").  Respondent contends that some of Banks' claims are unexhausted. Therefore, the Court will address the threshold question of exhaustion as it arises in each ground.

Procedural Bar

The Supreme Court has also considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. See, e.g., Francis v. Henderson, 425 U.S. 536 (1976). Habeas relief may be denied if a state disposed of an issue on an adequate and independent state procedural ground. Coleman, 501 U.S. at 750. See also Medlock v. Ward, 200 F.3d 1314, 1322-23, 1328 (10th Cir. 2000).

A state court's finding of procedural default is deemed "independent" if it is separate and distinct from federal law. Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998). If the state court finding is applied "evenhandedly to all similar claims," it will be considered "adequate." Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)).

To overcome a procedural default, a habeas petitioner must demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. Coleman, 501 U.S. at 749-50; Wainwright, 433 U.S. 72.

Standard of Review

This Court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow, 474 F.3d at 696). When a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the

state decision "was contrary to, or involved an unreasonable application of, clearly established[7] Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(1)(2); Williams v. Taylor, 529 U.S. 362, 402 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).

The first step in applying § 2254(d)(1) standards is to assess whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings of the Supreme Court. House v. Hatch, 527 F.3d 1010, 1016-17 (10th Cir. 2008). If clearly established federal law exists, the Court must then consider whether the state court decision was contrary to or involved an unreasonable application of the Supreme Court law. Id. at 1018. When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002). It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. Early v. Packer, 537 U.S. 3, 8 (2002).

Application of § 2254(d)(2) requires the Court to review any factual findings of the state court to ascertain whether they were unreasonable in light of the evidence presented at trial. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, - - U.S. - -, 130 S.Ct. 841,

---

[7]     A legal principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the Supreme Court. See Carey v. Musladin, 549 U.S. 70, 74 (2006).

849 (2010) (citing <u>Williams</u>, 529 U.S. at 410).  The "determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Banks' habeas proceedings commenced well after the effective date of AEDPA.  Therefore, to the extent Banks' claims are cognizable in a federal habeas corpus proceeding and not procedurally barred or justify <u>de novo</u> review, those claims shall be reviewed pursuant to § 2254(d).

## III.

Petitioner asserts 13 grounds for relief in his petition for writ of habeas corpus, and asks the Court to vacate his conviction and death sentence.  Respondent argues that many of petitioner's claims are procedurally barred and, even if the Court can reach the merits of petitioner's claims, the OCCA has addressed petitioner's claims and the OCCA's rulings are entitled to deference.

<u>Ground One: Confrontation Clause</u>

Petitioner argues that the State's presentation of Walter Banks as a witness during the first stage of his trial violated the Confrontation Clause of the United States Constitution, because the State's questioning of Walter Banks implied that petitioner confessed to the murder of Sun Travis and Walter Banks was unavailable for cross-examination.   Dkt. # 10, at 27.   Respondent acknowledges that the OCCA recognized the trial court's error in allowing this testimony, but states that the OCCA found that the error was harmless.  Dkt. # 18, at 17-18.  Respondent argues that the OCCA's harmless error analysis was not an unreasonable application of established Supreme Court precedent.

During the first stage of trial, the State announced that it intended to call petitioner's brother, Walter Banks, as a witness, and defense counsel requested a hearing outside of the presence of the jury.  Walter Banks was present at the hearing.  The trial judge asked Walter Banks if he would

28

testify in compliance with the State's subpoena, and he informed the trial judge that he would invoke his Fifth Amendment privilege against self-incrimination.  Tr. Trans. at 548-49.  The trial judge advised Walter Banks that he did not have a valid Fifth Amendment privilege to refuse to testify. Walter Banks renewed his assertion of his Fifth Amendment privilege and stated that he did not know anything about the case, and it was clear that he would not answer any questions if called as a witness.  Id. at 550-51.  The trial judge permitted the State to call Walter Banks as a witness over petitioner's objection, and his entire testimony is as follows:

Q.      Mr. Banks, who killed Sun Travis?

A.      At this present time, I would like to invoke my Fifth Amendment privilege.

Q.      And what is your DOC inmate number?

A.      At this present time, I'm invoking my Fifth Amendment privilege.

Q.      Do you recall having a conversation with Fred Parke and George Gregory in April of '81?

A.      At this present time, I'm invoking my Fifth Amendment privilege.

Q.      And do you recall telling them that --

Mr. Bowen:      Objection, Your Honor.

The Court:      I'll sustain the objection.

Mr. Greer:      May I approach, Your Honor?

The Court:      Yes, sir.

Q.      (By Mr. Greer) Mr. Banks, I would like you to take a look at that letter and ask if that's your signature on the bottom?

A.      At this present time, I'm invoking my Fifth Amendment privilege.

Q.      Ask if that's your DOC inmate number?

A.      I'm invoking my Fifth Amendment privilege.

Q.      Can you read that highlighted portion for the jury?

A.      I'm invoking my Fifth Amendment privilege at the present time.

Q.      Do you recall writing this letter and stating that I had --

        Mr. Bowen:    Objection, Your Honor.

        The Court:    I'll sustain the objection.

Q.      (By Mr. Greer) Mr. Banks you're serving a life sentence for murder, aren't you?

A.      At this present time, I would like to invoke my Fifth Amendment privilege.

Q.      And you understand, sir, that you have no right to a Fifth Amendment privilege in this case?

        Mr. Bowen:    Objection, Your Honor.  That calls for a legal conclusion.

        The Court:    I have made a determination that he has no Fifth Amendment privilege in this case to decline to testify.

Q.      (By Mr. Greer) And you understand that, don't you?

A.      At the present time, I'm invoking my Fifth Amendment privilege.

Q.      Did your brother tell you --

        Mr. Bowen:    Objection, Your Honor.

        The Court:    Overruled.

Q.      (By Mr. Greer) Did your brother tell you that he killed Sun Travis?

        Mr. Bowen:    Objection, Your Honor.

        The Court:    Overruled.

A.      At the present time, I would like to invoke my Fifth Amendment privilege.

Tr. Trans. at 573-75.

Petitioner raised this issue on direct appeal to the OCCA, and the OCCA determined that the trial court erred by allowing Walter Banks to take the witness stand. <u>Banks</u>, 43 P.3d at 398. The trial court knew that Walter Banks would refuse to testify and permitted the State to ask questions implying that petitioner made an incriminating statement to Walter Banks. <u>Id.</u> The OCCA stated that the "only logical inference from the State/Walter Banks exchange is that Walter [Banks] knew the answer to both questions and that it was his brother, defendant Anthony Banks, who killed Sun Travis." <u>Id.</u> However, this error required reversal only if "(1) the State crafted its case around inferences arising from privilege invocation or (2) 'the witness's refusal to answer questions added critical weight to the State's case in a form not subject to cross-examination.'" <u>Id.</u> The OCCA found that the State did not build its case around any improper inference created by Walter Banks' non-responses to questions posed by the State and the State did not mention Walter Banks' refusal to testify at any point during the trial. The OCCA also considered the strength of the evidence against petitioner and found that any error was harmless beyond a reasonable doubt. <u>Id.</u>

Petitioner claims that the State's questioning of Walter Banks violated his right to confront the witnesses against him as provided by the Sixth Amendment of the United States Constitution. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides a person accused of a criminal offense "the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. The Supreme Court has found that the right of an accused to confront the witnesses against him is a fundamental right that is incorporated against the states. <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965). When this case was tried in 1999, <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), had not been decided, and the key Supreme Court precedent concerning application of the

Confrontation Clause was <u>Ohio v. Roberts</u>, 448 U.S. 56, 63 (1980).[8]  Under <u>Roberts</u>, a hearsay statement made by a witness who is unavailable for cross-examination is admissible only if the statements are "marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'"  <u>Roberts</u>, 448 U.S. at 65.  For the purpose of AEDPA, <u>Roberts</u> clearly established that a criminal defendant had the right to confront the witnesses against him, to require the witness to testify under oath, to allow the factfinder to view the witness' demeanor, and to require the witness to face the defendant as he testifies, and the government bears the burden to prove that a hearsay statement should be admitted when a witness is unavailable.  <u>Cook v. McCune</u>, 323 F.3d 825, 832 (10th Cir. 2003).

The OCCA determined that the trial court should not have permitted the State to call Walter Banks as a witness, because the trial court knew that Walter Banks would refuse to testify and would be unavailable for cross-examination.  Respondent does not contest that petitioner's rights under the Confrontation Clause were violated, but argues that this Court's review is limited to the issue of whether the OCCA's harmless error analysis was contrary to or was an unreasonable application of Supreme Court precedent.  Petitioner cites cases from numerous federal courts in an attempt to show that the OCCA's harmless error analysis should be overturned on habeas review.  <u>See</u> Dkt. # 29, at 5.  However, a federal court may grant habeas relief only if a state court's decision is contrary to or is an unreasonable application of "clearly established federal law" as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1); <u>Alverson v. Workman</u>, 595 F.3d 1142 (10th Cir. 2010) (habeas petitioner not entitled to relief based on state court's failure to comply with the Tenth Circuit's

_____

[8]     The Tenth Circuit has determined that <u>Crawford</u> does not apply retroactively to cases on collateral review, because it does not meet either exception for retroactive application of a new rule of criminal procedure as set forth in <u>Teague v. Lane, 489 U.S. 288 (1989)</u>.  <u>Brown v. Uphoff</u>, 381 F.3d 1219, 1226-27 (10th Cir. 2004).

decision in Liles v. Saffle, 945 F.2d 333 (10th Cir. 1999), because the Supreme Court had not recognized or approved of the Tenth Circuit's extension of Ake). The Court will rely on the OCCA's finding to establish that petitioner's Confrontation Clause rights were violated, and will limit its review to whether the OCCA's harmless error analysis was contrary to or was an unreasonable application of clearly established federal law.

Petitioner acknowledges that the OCCA applied the correct legal standard for harmless error review, but argues that the OCCA's application of established Supreme Court precedent was unreasonable. Dkt. # 10, at 36; Dkt. # 29, at 15. The applicable Supreme Court precedent establishing the proper standard for harmless error review is Chapman v. California, 386 U.S. 18 (1967). Saiz v. Ortiz, 392 F.3d 1166 (10th Cir. 2004). If the state court engages in harmless error analysis under Chapman, a federal court may grant habeas relief only if the state court's application of Chapman was unreasonable. Herrera v. Lemaster, 301 F.3d 1192 (10th Cir. 2002). Under Chapman, any error resulting in a violation of a criminal defendant's constitutional rights is harmless only if the error is harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24.

The Court finds that the OCCA's application of the harmless error standard was not an unreasonable application of clearly established federal law. Petitioner argues that the State built its case around inferences from Walter Banks' non-responsive answers to the State's questions, because the only direct evidence that petitioner killed Sun Travis were these inferences. Dkt. # 10, at 37-39. The OCCA rejected this argument and the OCCA's decision was not unreasonable. The OCCA found that the State's case was built on DNA evidence found on Sun Travis' clothing and body, and petitioner's own statement placed him at the scenes of the kidnapping, rape, and murder of Sun Travis. Banks, 43 P.3d at 398. Although the State commented on petitioner's Walter Banks theory, this was a reference to petitioner's assertion that Walter Banks might have been involved in the

33

murder of Sun Travis, and the State did not make any references to Walter Banks' invocation of his Fifth Amendment privilege or rely on any inferences from Walter Banks' testimony. Petitioner argues that the State mischaracterized his statement to Parke in 1979, and he did not admit to participating in the kidnapping, rape, or murder of Sun Travis. Dkt. # 10, at 38. The State rebutted this argument with DNA evidence casting doubt on petitioner's statement, and petitioner may not rely on the alleged truth of his version of events in an attempt to make Walter Banks' invocation of his Fifth Amendment privilege more prejudicial than the record reflects. The combination of the DNA evidence and petitioner's own admissions that he was present during the crime were strong evidence of his guilt, and the OCCA did not unreasonably apply these facts when performing a harmless error analysis. 28 U.S.C. § 2254(d)(2).

Petitioner also raises the issue of Walter Banks' testimony as it relates to the second stage of the trial, and he argues that the State used inferences from Walter Banks' answers to the State's questions to rebut his relative culpability argument. Dkt. # 10, at 39. The OCCA addressed this aspect of petitioner's claim on direct appeal, and denied this claim for the reasons stated in its review of the first stage error. Banks, 43 P.3d at 402. The OCCA's resolution of this issue was not an unreasonable application of Supreme Court precedent. Contrary to petitioner's argument, it would not have been uncontested that Nelson was the person who actually shot Sun Travis if Walter Banks had been prohibited from taking the witness stand. The DNA evidence linking petitioner to the kidnapping and rape of Sun Travis and his admission that he was present for the entire series of crimes committed against Sun Travis were strong evidence that he fully participated in all aspects of the criminal conduct, and the jury was not required to believe petitioner's self-serving statement that he was merely a bystander when Sun Travis was murdered. During the second stage, the State

also presented evidence that petitioner admitted to killing a convenience store clerk to avoid arrest in a robbery, and he told his ex-wife that "dead men tell no tales." This evidence cast doubt on petitioner's relative culpability argument and supported the State's argument that Sun Travis was murdered for the purpose of avoiding arrest or prosecution. Petitioner's argument that the State built its case for the death penalty around Walter Banks' testimony is not supported by the record, and the OCCA's resolution of this issue was neither contrary to nor an unreasonable application of clearly established federal law. Under 28 U.S.C. § 2254(d)(1), petitioner is not entitled to habeas corpus relief on this claim.

Ground Two: Evidence of Other Crimes

Petitioner argues that the State injected evidence of other crimes into the first stage of trial, and this violated his right to a fair trial under state and federal law. Dkt. # 10, at 40. He claims that the OCCA failed to address his federal due process argument in its decision,[9] although he acknowledges the OCCA rejected his argument on direct appeal that the alleged statements containing other crimes evidence violated petitioner's rights under state law or even that the State made any statement during the first stage of trial implying that petitioner committed other crimes. Id. Respondent states that the OCCA considered petitioner's argument that evidence of other crimes was improperly admitted at trial and rejected it, and the OCCA's decision is entitled to deference

---

[9]    It is not clear that petitioner's argument is based on an alleged constitutional violation, because the admission of other crimes evidence at his trial was regulated by state law. He cites Huddleston v. United States, 485 U.S. 681 (1988), but that case concerns the application of Fed. R. Evid. 404(b). The general rule is that "a state court's misapplication of its own evidentiary rules . . . is insufficient to grant habeas relief." Bullock v. Carver, 297 F.3d 1036, 1055 (10th Cir. 2002). However, the Court may consider whether the admission of alleged other crimes evidence "considered in light of the entire record . . . resulted in a fundamentally unfair trial," but the issue before the Court is not merely whether other crimes evidence was improperly admitted at trial. Knighton v. Mullin, 293 F.3d 1165 (10th Cir. 2002)

under the AEDPA.  Dkt. # 18, at 24-25.  Respondent also argues that petitioner is not entitled to habeas relief based on an evidentiary ruling unless the admission of the evidence rendered his trial fundamentally unfair, and the alleged other crimes evidence does not meet this standard.  Id. at 26.

Petitioner claims that the prosecutor made three statements during the first stage of trial suggesting that petitioner contacted police in 1979 to make a deal, and these statements created an inference that petitioner had been accused or convicted of another crime.  In his opening statement, the prosecutor stated "in November of 1979, the first break in this case came.  And it came when this defendant, Anthony Rozelle Banks, needed some help from the police.  So he went to them and volunteered information about the murder of Sun Travis."  Tr. Trans. at 352.  In closing argument, the prosecutor commented on the circumstances surrounding petitioner's November 1979 statement to police:

> Well, you can get if DNA – if he would have known that DNA would have linked him to this case back then, he would have come up with some explanation for his semen being in [Sun Travis'] vagina and on her pants.  If he's such an innocent bystander that he holds onto this evidence for five months and finally tells the police when he wants relief in November of 1979, an innocent bystander holding on to this valuable evidence of a murder.

Tr. Trans. at 826 (emphasis added).  The prosecutor also stated that petitioner approached police in November 1979 "to try to get himself out of trouble . . . ."  Id. at 867.  Defense counsel did not object to any of these statements.[10]  On direct appeal to the OCCA, petitioner argued that he was prejudiced by the admission of improper evidence of other crimes, and cited to Oklahoma law

---

[10]   In fact, defense counsel directly asked Parke during the second stage why petitioner approached Parke in 1979, and Parke testified that petitioner was hoping to obtain a plea deal by providing this information.  Thus, this evidence would have been presented to the jury in the second stage even without the statements by the prosecution to which petitioner now objects, and it is not clear that defense counsel viewed this evidence as harmful to petitioner.  See Tr. Trans. at 920.

limiting the use of other crimes evidence.  Appellant's Brief at 44-46, Case no. F-99-1483 (Okla. Crim. App.).  He also suggested that the prosecutor's statements violated petitioner's rights under the United States Constitution, although he did not cite a particular constitutional provision or a Supreme Court case.  The OCCA rejected petitioner's argument that the prosecutor's statements constituted evidence of other crimes because "[n]one of these comments informed the jury that [petitioner] had committed any other crimes, and the mere suggestion that he may have is not improper."  Banks, 43 P.3d at 398-99.  The OCCA also found that the statements were "fair comments on [petitioner's] motivation for giving his statement to the police."  Id. at 399.  The Court finds that petitioner fully exhausted this claim and the Court may reach the merits of this claim on habeas review.[11]  The parties dispute whether the OCCA's decision is entitled to deference under AEDPA.  Petitioner argues that the OCCA did not specifically mention the federal aspect of his claim, and AEDPA deference does not apply to the Court's review of this claim.  Respondent states that the OCCA rejected petitioner's claim that he was deprived of a fair trial due to the admission of other crimes evidence, and the OCCA reached the merits of petitioner's claim.  The OCCA's

---

[11]    Respondent argues that petitioner's claim is not fully exhausted, because he relies, in part, on an affidavit from a juror to support his argument that the State's alleged references to other crimes evidence deprived him of a fair trial, and this affidavit was not submitted to the OCCA.  However, a habeas petitioner may be permitted to attach "bits of evidence" not offered to the state court if the petitioner fairly presented the substance of his claim to the state court and the evidence does not place the petitioner's claim "in a significantly different legal posture . . . ."  Demarest v. Price, 130 F.3d 922, 932 (10th Cir. 1997).  In this case, petitioner has submitted the affidavit of Jason McShane Gordon, a juror in petitioner's trial, and McShane states that he inferred that petitioner was in custody for another crime when he made his statement concerning Sun Travis' murder to police in November 1979.  This does not alter the substance of petitioner's claim and merely bolsters his claim that the prosecutor's references to petitioner's motives for approaching police created an inference that petitioner had committed another crime.  McShane's affidavit does not alter the substance of petitioner's claim, and does not require the Court to deny habeas relief to petitioner's failure to exhaust this claim.

decision is entitled to deference under AEDPA if the OCCA decided the "substance" of petitioner's claim, "which means to 'apply controlling legal principles to the facts bearing upon [his] constitutional claim.'" Wilson v. Workman, 577 F.3d 1284, 1293 (10th Cir. 2009).  This is true even if the state court decides the claim without citing the relevant Supreme Court precedent.  Sandoval v. Ulibarri, 548 F.3d 902, 909 (10th Cir. 2008).  Although the OCCA did not discuss the federal aspect of petitioner's claim, it reached the substance of his claim that the state injected other crimes evidence into the case, and found that the cited statements did not constitute other crimes evidence. Banks, 43 P.3d at 398-99.  The OCCA referenced all three statements identified by petitioner and concluded that none of the statements constituted other crimes evidence.  Id.  The Court finds that the OCCA's rejection of petitioner's claim on state evidentiary grounds impliedly disposed of the federal issue raised by petitioner's claim, and it constitutes an adjudication on the merits that is entitled to deference under AEDPA.

However, even if the Court determined that the OCCA's decision was not entitled to deference, petitioner is still not entitled to habeas relief for the alleged admission of other crimes evidence.  In the context of habeas proceedings where no deference is shown to the state court's decision, a habeas petitioner must show that the admission of other crimes evidence, when considered in light of the entire record, resulted in a fundamentally unfair trial.  Knighton, 293 F.3d at 1171; Smallwood v. Gibson, 191 F.3d 1257 (10th Cir. 1999).  It is not clear that the cited statements actually reference other crimes allegedly committed by petitioner.  The State did not directly mention any specific crime committed by petitioner and trial counsel did not object to the prosecutor's comments during trial.  Even if these statements are treated as other crimes evidence, the jury was not informed of the nature of petitioner's other crimes and this evidence was not

particularly prejudicial.  Petitioner's motive for making a statement to police was relevant to the

State's case, because petitioner argued that he did not admit to kidnapping, raping, or murdering Sun

Travis in his November 1979 statement.   The State could comment on the circumstances

surrounding petitioner's statement to police, because petitioner relied on the statement as evidence

of his innocence.  Petitioner argues that the State's comments were made solely to suggest that he

was accused of another crime and the comments served no relevant purpose.  This highlights the

double-edged nature of petitioner's 1979 statement to police.  While petitioner argues that the 1979

statement establishes his innocence if taken at face value, it also places him at the scene of the

kidnapping, rape and murder of Sun Travis.  The circumstances surrounding the statement were

relevant to the first stage of trial and, even if references to petitioner's other crimes were prejudicial,

it was not unfairly prejudicial for the prosecutor to comment on petitioner's motive for coming

forward with evidence concerning Sun Travis' murder. Petitioner's trial was not rendered

fundamentally unfair by the State's comments on his motivation for making a statement to police

in November 1979, and this is not a basis for the Court to grant habeas relief.  The OCCA's

resolution of petitioner's claim concerning alleged other crimes evidence was not contrary to or an

unreasonable application of Supreme Court law.  28 U.S.C. § 2254(d)(1).  Petitioner is not entitled

to habeas corpus relief on this claim.

<u>Ground Three: Prosecutorial Misconduct</u>

Petitioner claims that prosecutors engaged in a wide range of conduct designed to inflame

the jury against him, and the prosecution's conduct deprived him of a fair trial. Dkt. # 10, at 46- 56.

Respondent argues that the prosecutor fairly commented on the evidence and any improper reference

to petitioner's right to silence was cured by the trial judge's admonishment to the jury to disregard the prosecutor's statements.[12]  Dkt. # 18, at 31-50.

There are two general types of prosecutorial misconduct: comments impugning a specific constitutional right and comments generally prejudicing a criminal defendant in the eyes of the jury. See Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  When a prosecutor's misconduct "directly affects a specific constitutional right such as the presumption of innocence or privilege against self-incrimination, a habeas petitioner need not establish that the entire trial was rendered unfair, but rather that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right."  Torres v. Mullin, 317 F.3d 1145, 1158 (10th Cir. 2003).  If prosecutorial misconduct does not impair the exercise of a specific constitutional right, a federal court may grant habeas relief only if the prosecutor's misconduct infected the trial with unfairness to the extent that it deprived the petitioner of the due process of law.  Donnelly, 416 U.S. at 642-44.  The Tenth Circuit has provided guidance for district courts when applying the Donnelly test to alleged claims of prosecutorial misconduct:

---

[12]    Petitioner attaches the affidavit of Mark D. Matheson, second chair defense counsel during petitioner's trial, in support of his claims of prosecutorial misconduct, but this evidence was not presented to the OCCA.  Dkt. # 10, Ex. 3.  Respondent argues that petitioner's claim is not fully exhausted due to petitioner's use of this exhibit and, if petitioner attempted to exhaust this claim, the OCCA would find the claim procedurally barred.  Dkt. # 18, at 32. However, respondent acknowledges that petitioner otherwise raised his claims of prosecutorial misconduct and the claims are exhausted except  for Matheson's affidavit. This exhibit does not place petitioner's claim "in a significantly different legal posture . . . " and it merely supports aspects of petitioner's argument that are apparent from the trial transcript.  See Demarest, 130 F.3d at 932.  Petitioner presented each of his claims of his prosecutorial misconduct to the OCCA on direct appeal and the OCCA considered and rejected those claims.  Banks, 45 P.3d at 401-02.  Thus, the Court finds that petitioner's claim is fully exhausted and not subject to a procedural bar due to the attachment of Matheson's affidavit to his petition for writ of habeas corpus.

To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly "could have tipped the scales in favor of the prosecution." . . . We also ascertain whether curative instructions by the trial judge, if given, might have mitigated the effect on the jury of the improper statements . . . . When a prosecutor responds to an attack made by defense counsel, we evaluate that response in light of the defense argument . . . . Ultimately, we "must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly.

Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994) (quoting Hopkinson v. Shillinger, 866 F.2d 1185, 1210 (10th Cir. 1989)). If the state court has considered a petitioner's claim and denied relief, a federal court may not grant relief on the basis of prosecutorial misconduct unless the state court's decision was contrary to or was an unreasonable application of clearly established federal law. Hamilton v. Mullin, 436 F.3d 1181, 1188 (10th Cir. 2006).

Petitioner argues that, during the penalty phase of trial, the prosecutor commented on petitioner's invocation of his right to silence, and the OCCA's failure to reverse petitioner's sentence was an unreasonable application of clearly established federal law. Dkt. # 10, at 47-48. During his closing argument, the prosecutor stated that "the other consistent factor through all these stories is that not once, not in the '70s, not in the '80s, not in '90s, not last week, not this week, has he come forward to be accountable for what has taken place." Tr. Trans. at 1081. Defense counsel objected to the statement, but his objection was overruled. The prosecutor added that petitioner had "not been held accountable or has said anything, even remotely – willing to come forward and say what happened." Id. Defense counsel again objected to the prosecutor's statement, and this time his objection was sustained. The trial judge admonished the jury to disregard the prosecutor's second statement. Id. Defense counsel moved for a mistrial based on the prosecutor's remarks referencing petitioner's invocation of his right to silence, but his motion was overruled. Id. at 1083. Petitioner

41

raised this issue on direct appeal and the OCCA recognized that the trial court erred by allowing any

commentary on petitioner's right to silence, but found that any error did not affect the outcome of

the second stage of trial:

> The comments were improper.  However, given their quick succession, we find that
> the trial court's admonishment cured any error from either comment.  Additionally,
> we find that these comments in the second stage argument did not contribute to the
> jury's sentencing decision as the aggravating circumstances outweighed mitigating
> circumstances.

Banks, 43 P.3d at 402.

Petitioner argues that the OCCA's resolution of this issue was an unreasonable application

of clearly established federal law, because the OCCA failed to consider the "substantial or injurious"

effects the prosecutor's statements had on the jury.  The OCCA recognized that the trial judge

should not have permitted any comment on petitioner's right to silence, but found that any error was

harmless.  This analysis is consistent with applicable Supreme Court precedent.  A prosecutor's

improper comment on a defendant's right to remain silent is trial error that is subject to a harmless

error analysis, and not every such violation requires reversal of a defendant's conviction or sentence.

Brecht v. Abramson, 507 U.S. 619 , 630 (1993); Hamilton v. Mullin, 436 F.3d 1181, 1187-88 (10th

Cir. 2006).  The OCCA found that the quick succession of the statements and trial judge's

admonishment following the second statement rendered any constitutional violation harmless.  The

OCCA also considered the weight of the evidence against petitioner in light of any mitigating

evidence, and found that the statements did not affect the outcome.  This conclusion was not an

unreasonable application of clearly established federal law.  The jury is presumed to follow the trial

judge's instructions to disregard improper comments.  Battenfield v. Gibson, 236 F.3d 1215, 1225

(10th Cir. 2001) (citing Weeks v. Angelone, 528 U.S. 225 (2000)).  The trial judge admonished the

jury to disregard the prosecutor's second statement concerning petitioner's right to remain silent, and this admonishment immediately followed a prior statement in a similar vein. While petitioner is correct the jury was not instructed to disregard the first statement, the OCCA determined that the statements came in quick succession and the admonishment following the second statement cured any prejudice. While the OCCA's analysis was not extensive, the OCCA acknowledged the constitutional error and conducted a harmless error analysis, and the OCCA did not unreasonably apply clearly established federal law.

Petitioner argues that the State's demonstrative exhibit entitled the "trail of terror" was so prejudicial that the entire second stage of trial was "infected with unfairness" and petitioner's due process rights were violated. At trial, the State prepared a demonstrative exhibit showing petitioner's criminal history and petitioner states that the words "trail of terror" were written in "bold, red, capital letters" on top of the exhibit. Dkt. # 10, at 50. Petitioner objected to the State's use of this demonstrative exhibit, but the trial court overruled his objection. On direct appeal to the OCCA, petitioner argued that the exhibit was prejudicial and inflammatory. The OCCA rejected this argument, because the exhibit accurately reflected petitioner's criminal history and was fair comment on evidence. Banks, 43 P.3d at 399. Petitioner does not cite a particular constitutional right that the State's use of this exhibit allegedly violated, and he is entitled to habeas relief only if the prosecutor's misconduct infected the trial with unfairness to the extent that it deprived petitioner of the due process of law. It was unnecessary for the prosecution to use inflammatory language such as "trail of terror" to describe petitioner's criminal history, but the Court finds that petitioner is not entitled to habeas relief on this claim. The OCCA found that the exhibit accurately represented petitioner's criminal history and he does not dispute that finding. Assuming that the State's use of

43

the "trail of terror" title was inflammatory, the presentation of accurate information about petitioner's criminal history did not render petitioner's trial so unfair that he was deprived of the due process of law.  See Donnelly, 416 U.S. at 645.

Petitioner claims that the State improperly commented during the first stage of the trial on other crimes committed by petitioner, and he was denied due process of law during the first and second stages of trial.  Dkt. # 52-53.  The Court has already addressed this issue and found that the cited comments did not constitute other crimes evidence and, assuming the statements improperly referenced other crimes, petitioner was not prejudiced by the statements.  See supra at III (Ground Two).  For the same reasons, the Court finds that the cited statements do not support petitioner's claim of prosecutorial misconduct.

Petitioner claims that the prosecutor made comments during his first stage closing argument that improperly invoked jury sympathy for the victim, and the comments were not supported by the evidence.  Dkt. # 10, at 52.  The prosecutor stated:

> The image of a woman, a young woman, being raped vaginally and anally, at the same time, taking turns.  We know there was more than one.  We know there was two men, with a gun there.  The scene of an abandoned field next to a street.  It's either pitch black in the middle of the night.  The sound of a gunshot firing.  The thud of a body hitting the ground, blood streaming from the face of Sun Travis.  I just implore you to listen to the evidence with all your senses, as to what took place.

Tr. Trans. at 858-59.  Petitioner argues that this type of argument violates the Supreme Court's decision in Booth v. Maryland, 482 U.S. 496 (1987), although he recognizes that Booth was later overruled in Payne v. Tennessee, 501 U.S. 808 (1991).  Respondent states that the OCCA rejected petitioner's argument on direct appeal, and the OCCA's decision was not an unreasonable application of clearly established federal law.

Petitioner raised this claim on direct appeal and the OCCA found that the prosecutor's statement "accurately described the victim's rape and brutal death." Banks, 43 P.3d at 401. Petitioner asserts that the prosecutor asked the jury to return a verdict based on sympathy for the victim, instead of the evidence presented at trial, and the statement was also improper victim impact evidence. The cited statement does not impact a specific constitutional right, and petitioner is entitled to habeas relief only if the "prosecutor's argument, viewed in light of the trial as a whole, resulted in a fundamentally unfair proceeding." Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002) (citing Donnelly, 416 U.S. at 643, 645). Commenting on the circumstances of the crime using properly admitted evidence does not violate any specific constitutional right of a criminal defendant. Id. The evidence presented at trial showed that the victim was kidnapped, vaginally and anally raped, and shot at close range in a deserted field near a street in Tulsa. While the evidence did not conclusively establish that petitioner and Nelson simultaneously raped the victim, this assertion was not wholly unsupported by the evidence and defense counsel did not object to the statement at trial. The OCCA's assessment of the challenged statement as an accurate description of the evidence is not based on an unreasonable interpretation of the facts presented at trial. Even assuming that the prosecutor took some liberty with the evidence and appealed to jury sympathy, the OCCA's decision that the challenged statement fairly characterized the evidence is entitled to deference, and petitioner's claim based on the prosecutor's alleged appeal to jury sympathy is not a basis for habeas relief.

Petitioner argues that the prosecutor urged the jury to convict him out of a sense of civic duty, and the prosecutor's comments deprived him of a fair trial. Dkt. # 10, at 53. The prosecutor stated that "the people of the state of Oklahoma are entitled to a guilty verdict." Tr. Trans. at 832.

45

Petitioner claims that the prosecutor stated a personal opinion about petitioner's guilt and bolstered this opinion by aligning himself with the State, and this was an improper appeal to the jury's civic duty during closing argument. Respondent asserts that the prosecutor was permitted to request a verdict in the State's favor and the cited comment is nothing more than persuasive argument.

The OCCA found that petitioner took certain comments out of context and, when viewed in light of the prosecutor's full closing argument, the cited comments were "simply an assertion to the jury that the evidence supported a verdict of guilt." Banks, 43 P.3d at 402. When the cited comments are viewed in context, it is clear that the OCCA's resolution of this issue is not an unreasonable application of the law or the facts. Petitioner objects to the prosecutor's statement that "the people of the State of Oklahoma are entitled to a guilty verdict," but the full context of the statement is as follows:

> And, ladies and gentlemen, when you apply the law in this case and your common sense, your common sense to the evidence, you will come up with the only verdict in this case that justice demands, a verdict finding this defendant, Anthony Rozelle Banks, guilty of murder in the first degree. Anthony Rozelle Banks was entitled to his day in court, and he got it. Anthony Rozelle Banks was entitled to a trial by a fair and impartial jury and to be presumed innocent, and he got that. That is all he's entitled to. And because Anthony Banks murdered, kidnapped, and raped Sun Travis, the people of the state of Oklahoma are entitled to a guilty verdict. Thank you.

Tr. Trans. at 832. The prosecutor was permitted to request a verdict in favor of the State, and there is no indication that the prosecutor attempted to bolster his request for a verdict in the State's favor with an inappropriate plea to the jury's sense of civic duty. In his final closing, the prosecutor stated that "from the State of Oklahoma's perspective, we stand up here proudly with our case and our rights for justice," and petitioner argues that the prosecutor improperly expressed a personal belief,

46

supported by the State itself, that defendant was guilty.  However, this implication is not evident

from the full context of the statement:

> We have heard from defense counsel, and I'll say something.  You can talk, and you
> can talk, and you talk, and you can talk.  It doesn't change things.  And from the
> State of Oklahoma's perspective, we stand up here proudly with our case and our
> rights for justice.  And I don't want you to believe anything because you think it's
> so.  You heard the evidence.  You evaluate it.  You are the jurors, and you will
> decide his accountability.  Neither I or Mr. Greer are taking that away from you.
> You decide.

Tr. Trans. at 859.  Although the prosecutor referenced the "State of Oklahoma's" perspective, he

did not follow up this remark with any statements designed to bolster the State's case by improper

references to the jury's sense of civic duty.  Instead, he asked the jury to independently consider the

evidence and return a verdict based on the evidence without regard to the arguments presented by

the attorney for either side.  This was not improper.  The OCCA's determination that the

prosecutor's statements were "simply an assertion to the jury that the evidence supported a verdict

of guilt" was not an unreasonable application of clearly established federal law, and petitioner is not

entitled to habeas relief because of these statements.

Petitioner argues that the prosecution used inflammatory language designed solely to

dehumanize him, and "play[ed] on the jury's own fear of crime" when seeking a guilty verdict.  Dkt.

# 10, at 54.  He claims that the prosecutor's comments were not supported by the evidence and were

intended to inflame the jury against petitioner.  Respondent claims that the prosecutor's comments

were supported by the evidence, and the OCCA's finding that petitioner was not prejudiced by the

allegedly inflammatory statements is entitled to deference.  Dkt. # 18, at 46.

The prosecutor opened his first stage closing argument with the following statement:

> Ladies and gentlemen, a wild animal that stalks its prey, a predator who lurks in the
> shadows of an apartment complex and waits for the perfect opportunity to strike.

47

> And then when the moment is right, he snatches his victim away from her husband and away from her life.  And he severely abuses her, rapes her, and executes her, Mafia style, at 36th Street North.  That's what this case is all about, and that's what it's always been about.
>
> Why did this defendant choose this victim, Sun Travis, to do this to?  I'll tell you, a monster like this will always select the perfect victim, helpless and unaware.

Tr. Trans. at 820-21.  The prosecutor also commented on petitioner's statement to police in 1979, and attempted to cast doubt on the truth of petitioner's statement:

> If he's such an innocent bystander that he holds onto this evidence for five months and finally tells the police when he wants relief in November of 1979, an innocent bystander holding on to this valuable evidence of a murder.  Mr. Banks, did you aid this victim that you saw murdered in cold blood?  Mr. Banks, did you call 911?  Mr. Banks, did you go call the police?  Well, five months later when [he] wanted a break for [himself], [he] did.  That's not consistent with an innocent bystander.  It's consistent with a cold-blooded killer who has ice water running through his veins.

Tr. Trans. at 826-27.  Defense counsel did not object to these statements at trial.  Petitioner challenged these statements on direct appeal, but the OCCA did not expressly consider this claim on direct appeal.[13]  Duckett v. Mullin, 306 F.3d 982, 990 (10th Cir. 2002) (affording no deference to the OCCA when an issue was raised on direct appeal and the OCCA "obviously overlooked" the claim when denying relief).  Thus, there is no decision to which this Court can defer and the Court will review this aspect of petitioner's prosecutorial misconduct claim de novo.

Petitioner claims that the OCCA has granted relief for prosecutorial misconduct when a prosecutor has made comments dehumanizing a defendant.  Dkt. # 10, at 43.  However, petitioner has not alleged that the statements violated a specific constitutional right and the Court must

---

[13]   The OCCA briefly considered petitioner's arguments that "all unobjected-to comments were plain error," but rejected this claim without explanation or analysis.  Banks, 43 P.3d at 402.  It is not clear that the OCCA actually considered the specific statements objected to by petitioner in his habeas petition, and the OCCA's rejection of petitioner's claims concerning "unobjected-to" statements by the prosecution is not entitled to deference.

consider whether the prosecutor's remarks, when viewed in light of the entire trial, deprived petitioner of a fair trial.  Prosecutors may not engage in personal attacks against a criminal defendant.  Le v. Mullin, 311 F.3d 1002, 1021 (10th Cir. 2002).  However, a federal court may grant habeas relief only if "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" and this is a "narrow" standard of review.  Darden v. Wainwright, 477 U.S. 168 (1986).  It was improper for the prosecutor to compare petitioner to a "wild animal," but the comment was not wholly inconsistent with the State's theory of the case.  The State argued that petitioner and Nelson kidnapped a helpless victim, raped her, and murdered her to prevent law enforcement officials from discovering their identity.  The Court has reviewed the entire trial transcript and finds that these statements alone did not deprive petitioner of a fair trial, and the outcome would not have changed even if the prosecutor had not made these statements.  Therefore, petitioner is not entitled to habeas relief due to dehumanizing comments by the prosecutor.

Petitioner argues that the prosecutor made disparaging remarks about defense counsel and petitioner's theory of the case, and this violated his right to a fair trial. Dkt. # 10, at 55.  During final closing argument of the first stage of trial, the prosecutor asked the jury to reject defense counsel's argument about the lack of direct evidence and called this argument "one of the oldest tricks in the book for defense counsel."  Tr. Trans. at 860.  He also stated that:

> The game here is to say we haven't done anything.  Haven't done – haven't presented any evidence, haven't done this, haven't done that.  Play the race card.  Do anything you can to somehow divert your attention from the focus of this case.

Id. at 868-69.  Respondent claims that the prosecutor was responding to arguments raised by defense counsel in his closing argument, and the challenged statements were appropriate commentary on defendant's theory of the case.

The OCCA found that these statements "were not particularly egregious and may be viewed as challenging Bank's defense in light of the evidence."  Banks, 43 P.3d at 402.  Respondent acknowledges that a prosecutor may not demean defense counsel or disparage a defendant's arguments.  See Le, 311 F.3d at 1021; Duckett, 306 F.3d at 911.  However, respondent argues that the OCCA's resolution of this claim was not unreasonable and the OCCA's decision is entitled to deference.  Although the prosecutor should have avoided language tending to demean defense counsel, the OCCA's decision was not an unreasonable application of clearly established federal law.  The challenged statements were made in the State's final closing argument during the first stage, and were made in response to defense counsel's argument that the circumstantial evidence was insufficient to support a conviction.

Petitioner also argues that the cumulative effect of the alleged prosecutorial misconduct violated his right to a fair trial and penalty phase.  Dkt. # 10, at 55-56.  Petitioner has identified one instance of prosecutorial misconduct impugning a specific constitutional right and has alleged six other types of non-constitutional prosecutorial misconduct, and claims that the combined effect of the prosecution's conduct rendered his trial fundamentally unfair.  However, the Court has found only one harmless error - the prosecutor's improper comments on petitioner's right to remain silent - and has rejected his other claims.  The cumulative error doctrine does not apply, because defendant has not identified multiple instances of prosecutorial misconduct that have been deemed harmless.

<u>Hooper</u>, 314 F.3d at 1178 (cumulative error analysis applies when the habeas petitioner has identified two or more instances of harmless error).

The OCCA's resolution of petitioner's claim of prosecutorial misconduct was not contrary to or an unreasonable application of Supreme Court law, and he is not entitled to habeas relief on this claim. 28 U.S.C. § 2254(d)(1).

<u>Ground Four: Brady Violation</u>

Petitioner claims that the State suppressed exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because Allen Nelson made a statement potentially implicating Walter Banks in the murder of Sun Travis and Nelson's statement was not disclosed to petitioner before trial.  Dkt. # 10, at 56-61.  When drafting his petition for writ of habeas corpus, petitioner claims that he discovered the following statement in Allen Nelson's penitentiary pack (pen pack) maintained by the Oklahoma Department of Corrections (DOC):

> I called his mother Della Smith at 1-918-632-9896 and she told that △ had told her Anthony Banks was the brother to the one who did the murder but was not sure.

Dkt. # 10, Ex. 4.  The notes were taken by a DOC employee identified as "S. Law" on June 23, 1997, but petitioner and Nelson were not formally charged with Sun Travis' murder until August 6, 1997.  Petitioner claims that Nelson's alleged statement to his mother implicates Walter Banks in the murder of Sun Travis and would have supported his theory that the DNA found on Sun Travis' body and clothing belonged to Walter Banks, instead of petitioner.

Petitioner did not raise this claim on direct appeal or in his initial motion for post-conviction relief, and respondent argues that petitioner's <u>Brady</u> claim is procedurally barred.  Respondent is correct that petitioner did not raise this claim on direct appeal or in his initial motion for post-conviction relief, and ordinarily this claim would be procedurally barred unless petitioner could

establish cause and prejudice or a fundamental miscarriage of justice.  See Coleman v. Thompson,

501 U.S. 722 (1991).  However, the OCCA considered the merits of petitioner's Brady claim when

ruling on his "successor" petition for post-conviction relief, and did not find that the claim was

procedurally barred.  Thus, the OCCA reached the merits of this issue and respondent may not rely

on a state procedural bar to preclude federal habeas review.  Hawkins v. Mullin, 291 F.3d 658, 663

(10th Cir. 2002).

Although the Court may reach the merits of this issue, petitioner fails to acknowledge that

the OCCA resolved this claim on the merits and the OCCA's decision is entitled to deference under

AEDPA.  The OCCA held that:

> Whether or not this statement is even "potentially" exculpatory, it is immaterial.
> Anthony Banks was convicted on his own admissions and the DNA evidence
> establishing his presence when the victim was abducted, raped and murdered.  As
> such, we are confident in the verdict from his trial and in finding that the omission
> of this evidence did not vitiate its fairness.

The OCCA denied relief on the materiality prong of petitioner's Brady claim, and this is a ruling on

the merits of petitioner's federal claim.  Petitioner is entitled to habeas relief only if he can show that

the OCCA's rejection of his Brady claim was an unreasonable application of clearly established

federal law.  See Moore v. Gibson, 195 F.3d 1152, 1165 (10th Cir. 1999) (federal court reviewing

a Brady claim applying AEDPA deference must "consider whether the state appellate court's

materiality determination amounts to an 'unreasonable application' of clearly established Supreme

Court precedent").

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373

U.S. at 87.  A Brady claim has three essential elements: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued," meaning that the suppressed evidence is material for Brady purposes.  Douglas v. Workman, 560 F.3d 1156, 1173 (10th Cir. 2009).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987).  The Supreme Court has identified three general situations in which Brady may apply:

> first, where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured; second, where the Government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence; and third, where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way.

Kyles v. Whitley, 514 U.S. 419, 433 (1995).  In the third situation, a defendant is entitled to relief only if "suppression of the evidence would be 'of sufficient significance to result in the denial of a defendant's right to a fair trial.'" Id.

Respondent argues that the statement is hearsay and it would not have been admissible at trial.  This argument is a red herring.  The statement, as recorded in Nelson's pen pack, is actually double hearsay, but the admissibility of the statement itself is not the issue.  It is a statement by Della Smith to a DOC employee, and Smith's statement contains Nelson's alleged statement implicating Walter Banks in a murder.  Petitioner argues the statement provided support for his argument that Walter Banks was involved in the murder of Sun Travis, and the statement reasonably suggests that petitioner's attorney could have investigated additional sources of evidence, such as

Smith, to support this theory.  Thus, the fact that the statement itself may have been inadmissible at trial does not foreclose petitioner's <u>Brady</u> claim.

In this case, there is no dispute that the prosecution failed to disclose Smith's statement to petitioner's attorney before trial.  However, there is an issue as to whether Smith's statement is exculpatory or material, or even if Smith was referring to the murder of Sun Travis.  The statement mentions a murder and suggests that Walter Banks was involved, but this could be a reference to the Fremin murder.  Walter Banks was involved in the Fremin murder, and there was a factual dispute as to whether petitioner or Walter Banks killed Fremin.  <u>See</u> <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1511-13 (10th Cir. 1995).  From the context of the statement, it appears that Law was investigating whether there was a pending murder charge against Nelson and petitioner, because petitioner had made a claim that Nelson committed a murder.[14]  Dkt. # 10, Ex. 4.  Petitioner's claim that Nelson committed a murder appears to be a reference to the murder of Sun Travis, as Nelson was not charged or implicated as a suspect in the Fremin murder.  There is no context for Smith's statement to Law, and it is not clear if she was referring to the murder of Fremin or Sun Travis.  However, assuming that Smith was referring to the murder of Sun Travis, her statement could potentially be exculpatory for petitioner, because the statement suggests that petitioner was the "brother to the one

---

[14]     Law was investigating petitioner's claim that Nelson committed a murder because, if petitioner's allegations were true, it appears that the DOC was considering whether to place additional restrictions on Nelson or move him into a different area of the prison.  Dkt. # 10, Ex. 4.

who did the murder."[15]  Smith's statement expresses some equivocation about the substance of Nelson's statement to her but, taking the statement at face value, it is potentially exculpatory to petitioner.

The OCCA denied relief on the ground that Smith's statement was not material under <u>Brady</u>, because petitioner's own admissions and the DNA evidence placed petitioner, not Walter Banks, at the scene of the murder.  Petitioner argues that this was an unreasonable application of clearly established federal law, because he intended to argue that Walter Banks, not petitioner, was present during the abduction, rape, and murder of Sun Travis.  He claims that Smith's statement might have provided additional support for his argument that the DNA found on Sun Travis' clothing belonged to Walter Banks.  He also argues that Smith's statement casts doubt on the veracity of petitioner's statements to police in 1979, and suggests that petitioner may have been covering for his brother when he made the statement.  Petitioner advanced his theory that Walter Banks may have been present by cross-examining the State's expert witnesses and establishing that the existence of a close relative may reduce the statistical probability that DNA evidence taken from Sun Travis' clothing belonged to petitioner.  Throughout his petition, he argues that the only direct evidence of who committed the crime is his own statement to police in 1979, and he asks the Court to consider his statement as a truthful rendition of the facts.  However, in support of his <u>Brady</u> claim, he argues that he may have made up the 1979 statement to cover for his brother.  This is not the type of materiality

---

[15]      It is likely that Smith was referring to a statement made by Nelson about the Fremin murder, because it is unlikely that Nelson would mention the murder of Sun Travis when he had not been charged with that crime and it is not clear that Nelson or petitioner even knew that they were likely to be charged with the murder of Sun Travis.  However, the Court will assume that Smith's statement suggests that Walter Banks was involved with the murder of Sun Travis.

that supports a <u>Brady</u> claim.  <u>See</u> <u>Douglas</u>, 560 F.3d at 1174-75 (granting writ of habeas corpus under pre-AEDPA standards when prosecution failed to disclose non-duplicative impeachment against the sole witness linking the habeas petitioner to the crime); <u>Trammell v. McKune</u>, 485 F.3d 546, 551-52  (10th Cir. 2007) (suppression of key physical evidence that refuted eyewitness testimony used to convict habeas petitioner undermined confidence in the outcome of the trial); <u>Scott</u>, 303 F.3d at 1226 (prosecutor failed to disclose existence of a confession by another individual and this evidence could have been used to impeach witnesses linking the habeas petitioner to the charged murder).  Smith's statement to Law is equivocal and, while it is consistent with petitioner's Walter Banks theory, it contradicts his primary argument that his 1979 statement to police was truthful.  Viewing Smith's statement in light of the evidence presented at trial, the Court concludes that the jury would have reached the same result even if Smith's statement had been disclosed to defense counsel before trial.  The Court finds that the OCCA's rejection of petitioner's <u>Brady</u> claim due to petitioner's failure to establish the materiality of the undisclosed evidence is entitled to deference under § 2254(d)(1) and, even it is not, petitioner has not established the materiality prong of a <u>Brady</u> claim under a pre-AEDPA standard of review.

<u>Ground Five: Presentation of Intoxicated Expert Witness during Penalty Phase</u>

Petitioner argues that the psychologist who testified on petitioner's behalf during the penalty phase of trial was intoxicated during his testimony, and petitioner was deprived of an opportunity to present a competent mental health expert in his defense.  Dkt. # 10, at 61-68.  This claim has two prongs.  First, petitioner argues that he was denied a competent mental health expert in violation of

<u>Ake</u>.[16]  Second, he claims that defense counsel was ineffective for failing to request a continuance

or take some action to prevent prejudice to petitioner due to the defense psychologist's intoxication.

Respondent asserts that both claims are procedurally barred, because neither claim was raised on

direct appeal or petitioner's initial motion for post-conviction relief and the OCCA found that the

claims were procedurally barred when asserted in petitioner's "successor" post-conviction motion.

Dkt. # 18, at 55.

Petitioner called Phillip J. Murphy, M.D., a licensed clinical psychologist, to testify during

the penalty phase.  Dr. Murphy conducted psychological testing on petitioner in 1993 and 1999.  In

1993, Dr. Murphy concluded that petitioner likely suffered from a right frontal brain anomaly and

that petitioner exhibited paranoid responses to stressful situations.  Tr. Trans. at 1014.  He testified

the term "right frontal brain anomaly" was a very general term to describe a neurological disorder,

and this disorder rendered petitioner unable to form good judgments or interpret standard social

cues.  <u>Id.</u> at 1014-15.  Dr. Murphy re-tested petitioner in 1999.  He found that petitioner's right

frontal brain anomaly was less prevalent and petitioner's paranoid defenses to stress had been

eliminated, and he described petitioner as a "normal individual."  <u>Id.</u> at 1016-17.  Dr. Murphy

reviewed psychological testing performed on petitioner in 1980 after he was taken into DOC

custody, and he testified that the testing showed that petitioner suffered from an antisocial

personality disorder at that time.  <u>Id.</u> at 1018.  He testified that petitioner would have been classified

as a psychopath in 1980, and described this condition to the jury:

---

[16]     In <u>Ake</u>, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment
requires a state to provide the assistance of a psychiatrist at the state's expense if the
defendant is unable to afford a psychiatrist and defendant's sanity or mental health is a
"significant factor" in the case.  <u>Ake</u>, 470 U.S. at 1091-92.

> What happens in psychopaths is that their conscience never gets laid down in the way that it would be for a normal human being. They don't feel guilt; they don't feel anxiety. They can do things that would horrify the rest of us very easily. And so that part was deficient in Mr. Banks in 1980.

Id. at 1019. This type of disorder is frequently caused by the lack of a male role model or the presence of a violent male role model in the home. Id. at 1028. Dr. Murphy testified that petitioner was no longer a psychopath in 1993, and petitioner's mental health seemed to be improving in a stable prison environment. Id. at 1024-26.

On cross-examination, the prosecution established that Dr. Murphy had testified in court over 80 times, and all but two of those times he testified on behalf of a criminal defendant. Id. at 1030. Dr. Murphy testified that his knowledge of the circumstances of the Sun Travis and Fremin murders came from petitioner and defense counsel, and Dr. Murphy believed that both murders occurred during convenience store robberies. Id. at 1034. Dr. Murphy acknowledged that he was aware that petitioner was involved in another homicide in 1970, but he did not know if petitioner was convicted of a crime in relation to that homicide. Id. at 1037-38. The prosecution produced a copy of a report documenting the psychological testing performed in 1980, and Dr. Murphy stated that he relied on that testing when forming his opinion that petitioner was a psychopath when he murdered Sun Travis. The report stated that "[t]he psychological test signs show no severe depression and no signs of gross psychotic pathology." Id. at 1046.

Although the trial transcript does not indicate any irregularities with Dr. Murphy's testimony, petitioner has submitted the affidavit of defense counsel James Bowen stating that Dr. Murphy was intoxicated and "obviously disheveled" when he testified during the penalty phase of petitioner's trial. Dkt. # 10, Ex. 8, at 1. He states that the trial judge smelled alcohol on Dr. Murphy's breath and commented that he "take[s] it that Dr. Murphy is a drinking man." Id. Bowen claims that Dr.

Murphy's testimony was "halting and unimpressive," and Dr. Murphy's demeanor eliminated any positive value from his testimony. However, he does not state whether he requested a continuance of the penalty phase or took any action to defer Dr. Murphy's testimony to prevent him from testifying while intoxicated. Mark Matheson also represented petitioner at trial, and he advised Bowen that Dr. Murphy looked unprofessional. Id., Ex. 9, at 1. Matheson states that Dr. Murphy was intended to be the "star witness" of petitioner's mitigation case, but Dr. Murphy's "unprofessional appearance and unconvincing presentation of [petitioner's] defense theory was apparent to the jury and did more to harm than to help [petitioner's] second stage case." Id.

Petitioner did not assert any claim concerning Dr. Murphy's testimony on direct appeal or in his initial motion for state post-conviction relief. The first time petitioner claimed that Dr. Murphy was intoxicated during his testimony was in his petition for writ of habeas corpus. After filing his petition for writ of habeas corpus in this Court, petitioner filed a second application for post-conviction relief with the OCCA requesting relief under Ake and Strickland v. Washington, 466 U.S. 668 (1984), based on Dr. Murphy's alleged intoxication during the penalty phase of petitioner's trial. The OCCA found that these claims could have been raised on direct appeal or in petitioner's initial application for post-conviction relief, and that the claims were procedurally barred.

Petitioner asserts serious allegations concerning the conduct of his mental health expert during the penalty phase of his trial. However, the OCCA found that petitioner's claims were procedurally defaulted, and the Court cannot reach the merits of petitioner's claim unless he can overcome this procedural bar. As noted above, habeas relief must be denied if petitioner's claim is barred by an independent and adequate state procedural rule, unless he can establish that one of

two narrowly-applied exceptions excuse the procedural default.  Coleman, 501 U.S. at 750.  To

overcome the procedural default of these claims, petitioner must demonstrate either: (1) good cause

for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental

miscarriage of justice would occur if the merits of the claims were not addressed in the federal

habeas proceeding.  Coleman, 501 U.S. at 749-50; Wainwright, 433 U.S. 72.

Petitioner argues that the OCCA did not cite any specific procedural rule and did not

expressly state that his claims were procedurally defaulted, and the Court should not infer that his

claims are procedurally defaulted.  This argument is not supported by the plain language of the

OCCA's order.  The OCCA stated:

> We also deny Propositions II and III, both of which could have presented in Banks's
> direct appeal or original application for post-conviction relief.  Based upon the
> material contained in his current application, we find that the legal and factual basis
> for Propositions II and III were available at the time of his direct appeal.

Order Denying Second Application for Post-Conviction Relief, Case no. PCD-2003-1222 (Okla.

Crim. App. Feb. 12, 2004).  Petitioner's Ake and Strickland claims concerning Dr. Murphy's

testimony were raised in Proposition II of his successor petition for post-conviction relief.  The

OCCA cited "22 O.S. 2001, § 1980(D)(8)(9)," but no such statute exists now or existed when the

OCCA issued its order denying petitioner's successor motion.  It appears that the OCCA meant to

cite OKLA. STAT. tit. 22, § 1089(D)(8) and (9), which does support the OCCA's finding that

petitioner's claims were procedurally barred due to his failure to raise the claims on direct appeal

or in his initial motion for post-conviction relief.  Section 1089 is an adequate and independent

procedural ground upon which the OCCA may deny relief, and petitioner's arguments to the

contrary are foreclosed by established Tenth Circuit precedent.  Cannon v. Gibson, 259 F.3d 1253,

1265-66 (10th Cir. 2001).  Petitioner argues that the Court may reach his claim based on ineffective

60

assistance of appellate counsel because, even if his <u>Ake</u> and <u>Strickland</u> "sub-claims" are procedurally defaulted, the OCCA did not address his ineffective assistance of appellate counsel claim. This argument is meritless.  Petitioner did assert in his second post-conviction application that appellate counsel was ineffective for failing to raise these claims on direct appeal, and the OCCA found that Proposition II, in its entirety, was procedurally barred.  Petitioner's claim based on ineffective assistance of appellate counsel is also procedurally defaulted, because he could have raised the claim in his initial application for post-conviction relief.

The Court cannot reach the merits of petitioner's claim unless he can establish cause and prejudice for the procedural default, or that a fundamental miscarriage of justice will result. Petitioner argues that cause can be established due to the ineffectiveness of appellate counsel for failing to raise petitioner's <u>Ake</u> and <u>Strickland</u> claims on direct appeal.  Dkt. # 10, at 68. Respondent argues that petitioner cannot demonstrate cause by relying on the alleged ineffective assistance of appellate counsel, because he did not present this claim to the OCCA in his initial motion for post-conviction relief.  The Supreme Court has held that ineffective assistance of appellate counsel may be used to establish cause, but the ineffective assistance of counsel must first be exhausted in the state courts before a federal court may consider the alleged ineffective assistance as cause to excuse a procedural default.  <u>Murray v. Carrier</u>, 477 U.S. 478, 488-89 (1986).  In this case, the OCCA found that petitioner's ineffective assistance of appellate counsel claim was procedurally barred, and he may not rely on ineffective assistance of counsel to establish cause.

Petitioner also argues that the fundamental miscarriage of justice exception applies, because he can show by a preponderance of the evidence that he was innocent of the murder of Sun Travis. In <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), the Supreme Court clarified that a petitioner may satisfy

61

the substantial miscarriage of justice exception by making a showing of actual innocence.  To meet

this standard, a habeas petitioner must show "that it is more likely than not that no reasonable juror

would have convicted him in light of . . . new evidence."  Id. at 327.  Petitioner argues that this

standard is "significantly less than the showing necessary to establish innocence as an independent

Constitutional violation."  Dkt. # 29, at 38.  However, the Tenth Circuit has addressed the

miscarriage of justice exception in light of Schlup, and has clarified that this is a very demanding

standard:

> To take advantage of the "actual innocence" gateway, a habeas petitioner must
> "present [ ] evidence of innocence so strong that a court cannot have confidence in
> the outcome of the trial unless the court is also satisfied that the trial was free of
> nonharmless constitutional error . . . .  The petitioner must "support his allegations
> of constitutional error with new reliable evidence-whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical evidence- that was not
> presented at trial."  This new evidence must be sufficient to "show that it is more
> likely than not that no reasonable juror would have convicted [the petitioner] in light
> of the new evidence.

Cummings v. Sirmons, 506 F.3d 1211, 1223 (10th Cir. 2007) (citations omitted).  Petitioner argues

that new evidence, as discussed in connection with Ground Four, bolsters his Walter Banks theory,

and there is a substantial likelihood that evidence of Walter Banks' involvement in the crime would

cast doubt on the reliability of the DNA evidence and the State's theory of the case.  As the Court

has noted, petitioner's Walter Banks theory contradicts his argument that his 1979 statement to

police was truthful.  Petitioner overstates the impact of Walter Banks' alleged involvement with the

Sun Travis murder as to the reliability of the DNA evidence and, even if Walter Banks were

involved, the DNA evidence found on Sun Travis' body still implicated petitioner as a participant

in the rape and murder of Sun Travis.  While the existence of a sibling may reduce the statistical

probability of another match, it does not change the fact that the DNA evidence found on the

victim's body and clothing matched petitioner's DNA.   Thus, petitioner has not shown that a reasonable juror would not have convicted him of the murder of Sun Travis and he has not made a showing of actual innocence sufficient to overcome the procedural bar for Ground Five.  Petitioner also cites Sawyer v. Whitley, 505 U.S. 333 (1995), and argues the procedural default of Ground Five can be excused if he shows by clear and convincing evidence that but for a constitutional error no juror would have found him eligible for the death penalty.   He argues that defense counsel's ineffective presentation of his mitigation case and the lack of direct evidence that petitioner killed Sun Travis resulted in the imposition of a death sentence in a case where the aggravating circumstances did not outweigh the mitigating circumstances.  Dkt. # 29, at 40-41.   However, the jury was informed about petitioner's social background, his mental health problems, and the likelihood that he would do well in a prison environment.   The State presented evidence that petitioner had an extensive criminal history, including another murder conviction and a violent attempt to escape from prison, that Sun Travis was murdered to hide the identity of her killers, and that petitioner provided misleading evidence about the Sun Travis murder in an attempt to reduce his sentence for another crime.   Even assuming that defense counsel's performance was deficient and petitioner's mitigation case could have been presented in a more effective manner, petitioner has not met his burden to show by clear and convincing evidence that he was ineligible for the death penalty but for the alleged ineffective assistance of counsel.   Thus, petitioner's claim is barred by an independent and adequate state procedural rule, and the Court may not reach the merits of his claim.   See Coleman, 501 U.S. at 750.

Even if the Court could reach the merits of petitioner's claim, the transcript of the penalty phase shows that Dr. Murphy testified that petitioner suffered from a psychopathic disorder in 1980,

but he had improved and would do well in a structured environment.  Petitioner presented other evidence to support his argument that he was successful in a prison environment.  Assuming that defense counsel was ineffective, petitioner has not shown that more effective testimony by Dr. Murphy would have changed the result of the penalty phase.  This is not a case where there was a lack of expert testimony concerning defendant's mental health, which could be ineffective assistance of counsel under some circumstances.  See Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) (defense counsel's complete failure to present substantial evidence of the defendant's organic brain disorders constituted deficient performance and was prejudicial to defendant).  Instead, Dr. Murphy testified on petitioner's behalf and explained petitioner's prior mental health history and his chances for success in a prison environment.  Petitioner apparently argues that he was prejudiced per se by Dr. Murphy's allegedly ineffective testimony, but he has not shown that there is a reasonable probability that at least one juror would have reached a different decision if Dr. Murphy had been a more effective witness.  Wiggins v. Smith, 539 U.S. 510, 536 (2003) (prejudice as to penalty phase is established if there is a substantial probability that one juror would not found the petitioner eligible for the death penalty).  Even assuming that Dr. Murphy was intoxicated during his testimony, the record shows that defense counsel was able to elicit all of the key points concerning petitioner's mental health from Dr. Murphy and the jury still determined that petitioner should be sentenced to death.  Thus, petitioner could not show that Dr. Murphy's allegedly ineffective testimony affected the outcome of the proceedings.

Ground Six: Second Stage Jury Instructions

Petitioner argues that the jury was not instructed to find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, and his sentence was

unconstitutional under clearly established Supreme Court precedent requiring the jury to find each fact necessary for a death sentence beyond a reasonable doubt. Dkt. # 68, at 68-69. Respondent asserts that the OCCA found this claim procedurally barred when it ruled on petitioner's initial application for post-conviction relief and, even if the Court were to consider this claim, petitioner is not entitled to relief because Oklahoma's scheme for imposing the death penalty is constitutional. Dkt. # 18, at 61.

Petitioner relies on <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), to support his argument that each fact necessary to impose a death sentence must by found by a jury beyond reasonable doubt. However, <u>Ring</u> was decided after petitioner was sentenced and respondent argues that <u>Ring</u> does not apply retroactively to cases on collateral review. See <u>Schriro v. Summerlin</u>, 542 U.S. 348 (2004) (<u>Ring</u> created a new rule of criminal procedure that does not apply retroactively to cases on collateral review). Under <u>Teague</u>, a case is final "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed." <u>Teague</u>, 489 U.S. at 294. <u>Ring</u> was decided on June 24, 2002, and the OCCA denied petitioner's appeal on February 21, 2002. However, petitioner filed a petition for writ of certiorari to the Supreme Court, and his petition was denied on January 13, 2003. See <u>Banks v. Oklahoma</u>, 537 U.S. 1126 (2003) (memorandum). Petitioner's conviction and sentence were not final when <u>Ring</u> was decided, and the Court may consider petitioner's argument that <u>Ring</u> rendered Oklahoma's sentencing process in death penalty cases unconstitutional.

Even though petitioner is not prohibited from bringing a <u>Ring</u> claim, respondent argues that petitioner asserted a similar claim in his initial motion for post-conviction relief and the OCCA found that petitioner's claim was procedurally barred. In Proposition II of his initial application for

post-conviction relief, petitioner argued that Oklahoma's scheme for imposing the death penalty is unconstitutional because the jury is not required to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and appellate counsel was ineffective for failing to raise this issue on direct appeal. The Court has reviewed the OCCA's order denying petitioner's initial application for post-conviction relief, and the OCCA's order is ambiguous as to whether the OCCA found this claim procedurally barred or denied relief on the merits. The OCCA stated that petitioner's challenge to the constitutionality of Oklahoma's death penalty scheme was available when petitioner filed his direct appeal but was not raised on direct appeal. Petitioner argued that any procedural bar was excused by appellate counsel's deficient performance by failing to raise the claim on direct appeal. The OCCA stated that appellate counsel's failure to raise the issue could not be used as cause to excuse the procedural bar, because petitioner's underlying claim concerning the constitutionality of the death penalty sentencing scheme was meritless. In a footnote, the OCCA cited prior cases rejecting this argument, and explained that the determination of whether the aggravating circumstances outweigh the mitigating evidence is a balancing process, instead of a factual finding, and this balancing process is not governed by the reasonable doubt standard. Order Denying Application for Post-Conviction Relief at 3-4, Case n. PCD-2001-1533 (Okla. Crim. App. May 7, 2002).

The OCCA did not expressly state that petitioner's claim was procedurally barred and, instead, rejected petitioner's claim on the merits. The Court will treat the OCCA's decision as an adjudication on the merits under § 2254(d) and will consider whether the OCCA's decision is entitled to deference under AEDPA. The OCCA phrased its discussion of Proposition II in terms of cause to excuse a procedural default, but proceeded to address the merits of the underlying

66

substantive claim.  Specifically, the OCCA found the substantive claim to be meritless, because the weighing of aggravating and mitigating circumstances is a balancing process, not a finding of fact by a jury, and the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), does not require a jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.  This constitutes an adjudication on the merits, and the Court finds that petitioner's claim is not procedurally barred based on the application of an adequate and independent state procedural rule.

Petitioner argues that the weighing of aggravating and mitigating circumstances is a factual finding that must be made by a jury under the reasonable doubt standard.  However, the OCCA has rejected the argument that this is a factual finding and, instead, treats the weighing of mitigating and aggravating circumstances as a balancing process.  See Torres v. State, 58 P.3d 214 (Okla. Crim. App. 2002); Revilla v. State, 877 P.2d 1143, 1153 (Okla. Crim. App. 1994).  Federal courts considering this issue in habeas proceedings have consistently found that Oklahoma's sentencing procedures do not violate Apprendi or Ring, and have accepted the OCCA's characterization of the weighing of aggravating and mitigating circumstances as a balancing process.  Matthews v. Workman, 577 F.3d 1175, 1195 (10th Cir. 2009); Phillips v. Sirmons, 2008 WL 1701093 (E.D. Okla. Apr. 9, 2008); Matthews v. Sirmons, 2007 WL 2286239, * 35 (W.D. Okla. Aug. 6, 2007); Cummings v. Gibson, 2006 WL 2434462 (E.D. Okla. Aug. 11, 2006).  Petitioner's argument concerning the constitutionality of Oklahoma's penalty phase instructions has been rejected by the Tenth Circuit and other federal courts.  The Court finds that the OCCA's decision to reject petitioner's challenge to the constitutionality of the penalty phase jury instructions was not contrary

67

to or an unreasonable application of clearly established federal law, and petitioner is not entitled to habeas relief on this claim.  28 U.S.C. § 2254(d)(1).

Ground Seven: Invalidity of Search Warrant for Petitioner's DNA

Petitioner argues that the search warrant used to obtain a DNA and/or a blood sample from him was invalid due to a lack of probable cause, and any evidence taken from his body, including blood and DNA samples, should have been suppressed before trial.  Dkt. # 10, at 75-76.  He claims that Parke made material misrepresentations or omissions in his affidavit for a search warrant to obtain a DNA and blood sample from petitioner, and the state court's decision to admit this evidence violated petitioner's rights under the Fourth Amendment.

On December 31, 1996, Parke requested a search warrant to take a blood sample from petitioner.  In full, the affidavit stated:

> Your affiant is a police officer for the Tulsa Police Department and has been for the past 29 years, and is currently assigned to the Homicide Unit.

> On 6-6-79, Sun Travis was returning to her home at 1117 South College.  Upon arrival at the parking lot, witnesses observed two black males in a vehicle approach the victim.  She was then placed in the suspects' vehicle, which then left the parking lot, taking the victim with them.

> On the morning of 6-7-79, the victim's partially clothed body was found laying alongside the roadway in the 1800 block of East 36th Street North, City and County of Tulsa, Oklahoma.  Examination revealed the victim had been shot one time in the head and also had been sexually assaulted.

> Samples recovered from the victim and her clothing have shown positive for both semen and sperm.

> Affiant has interviewed one Anthony Rozell Banks, who is currently in custody of the Department of Corrections.  The interview with Banks revealed that Banks was driving the vehicle the night the victim was abducted.  Banks maintains that the second individual, whom he named as Allen W. Nelson, is the one who is responsible for the victim's death, and that Nelson apparently sexually assaulted the victim then later shot her.

> Affiant has interviewed Allen Nelson, who adamantly denies having any involvement in this particular crime.
>
> Affiant has also interviewed one Walter Banks, who is currently in custody of the Department of Corrections at Conners Reformatory.  Walter Banks' interview revealed that he had information pertaining to the death of the victim, and that he named his brother, Anthony Banks, as the individual who killed the above-named victim.

O.R., Supp. Vol., at 526.  The affidavit was submitted to a judge in Greer County, Oklahoma, and the judge issued the search warrant.  Petitioner filed a pretrial motion to quash the search warrant and argued the motion at a hearing on September 1, 1999, but the trial judge failed to rule on the motion until the trial started and the jury had already been selected.  The trial judge made the following ruling:

> It was brought to my attention that apparently I had not ruled on what I would call a Franks v. Delaware motion in reference to the search warrant which was issued out of Greer County.  And I'll overrule that motion.  The substance of the motion is that – as indicated in Franks v. Delaware, that material misrepresentations in an affidavit, if and when they're made, the examination, as I understand it, is to examine the affidavit as though there is still probable cause within the affidavit.
>
> First of all, while the description in the first paragraph – and I think that was what the point was – was not totally consistent with the testimony of Fred Parke at the preliminary hearing, that this was a – said to be a material misrepresentation, first of all, I don't believe it to be a material misrepresentation.  It is true it is not exactly the same language.  And secondly, even without that language, there is – there was sufficient probable cause, I believe, for the Judge to have issued the warrant.

Tr. Trans. at 345-46.  Petitioner raised this issue on direct appeal and the OCCA affirmed the trial court's decision to deny petitioner's motion quash the search warrant.  The OCCA assumed that paragraph two of the affidavit contained misrepresentations, but determined the probable cause existed without that paragraph.  Respondent does not dispute that petitioner has exhausted this claim and it is properly raised in petitioner's habeas petition.  Dkt. # 18, at 68.

Petitioner focuses on paragraphs two and seven of Parke's affidavit in support of his request for a search warrant, and argues that both paragraphs contain material misrepresentations of fact. He claims that eyewitnesses could not identify the vehicle that followed Sun Travis' car into the apartment complex parking lot and the eyewitnesses did not see anybody approach Sun Travis.  Dkt. # 10, at 77-78.  He also claims that Parke had no independent evidence establishing that Sun Travis was placed in the vehicle driven by petitioner, and Walter Banks' alleged statement implicating petitioner was recanted almost as soon as it was made.  Id. at 78-79.  At a pretrial motions hearing on September 1, 1999, the State conceded that paragraph two of the affidavit contained inaccuracies. However, the State argued that the warrant still contained enough information to establish probable cause even without paragraph two.

Petitioner had a full and fair opportunity to litigate his Fourth Amendment challenge to the validity of the search warrant for a blood sample, and this is not a permissible basis for habeas relief. Stone v. Powell, 428 U.S. 465, 485-46 (1976); Smallwood v. Gibson, 191 F.3d 1257, 1265 (10th Cir. 1999) ("Under Stone, habeas relief shall not be granted on the ground that the trial court admitted evidence obtained in violation of the Fourth Amendment despite the judicially-created exclusionary rule, provided that the defendant had an opportunity for full and fair litigation of the Fourth Amendment claim.").  Petitioner challenged the admissibility of a blood sample and DNA evidence taken from the blood sample at the trial and appellate level, and his Fourth Amendment arguments were rejected.  In any event, the Court has reviewed the affidavit for search warrant and finds that the OCCA's decision was not an unreasonable application of clearly established federal law.  Even assuming that paragraphs two and seven of Parke's affidavit contained material misrepresentations or omissions, it was not unreasonable for the OCCA to affirm the trial court's denial of petitioner's

70

motion to quash the search warrant. The affidavit cited petitioner's own statement placing him at the scene of Sun Travis' rape and murder and correctly noted that both petitioner and Nelson denied murdering Sun Travis. The affidavit also stated that sperm and semen were found on the victim. This suggests that a DNA profile of Sun Travis' assailant could be found by testing the sperm or semen found on her body or clothing. It was not unreasonable for the issuing magistrate to find that there was probable cause to believe that petitioner was involved in the rape and murder of Sun Travis, and that a blood sample taken from petitioner could provide relevant evidence concerning the crime. The OCCA's finding that the search warrant for petitioner's blood sample was supported by probable cause is entitled to deference under 28 U.S.C. § 2254(d)(1) and, even if this claim were not barred by Stone, petitioner would not be entitled to habeas relief.

Ground Eight: Sufficiency of Evidence to Sustain Conviction

Petitioner argues that the State failed to present sufficient evidence to establish his guilt beyond a reasonable doubt. Dkt. # 10, at 81-93. He argues that there is no evidence that he killed Sun Travis and the evidence was insufficient to sustain a conviction for first degree murder. He also argues that the State failed to prove that petitioner kidnapped or raped Sun Travis, because he gave a statement to police denying any involvement with these crimes and the DNA evidence used to support his conviction was unreliable. Respondent argues that the OCCA has considered and rejected these arguments, and the OCCA's decision was not an unreasonable application of clearly established federal law. Dkt. # 18, at 71-73.

A habeas petitioner may challenge the sufficiency of evidence used to obtain his conviction in federal habeas corpus proceedings. Spears v. Mullin, 343 F.3d 1215, 1237 (10th Cir. 2003). "When reviewing the sufficiency of the evidence on a habeas corpus petition, the relevant question

71

is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S.

307, 319 (1979)).  The Court must consider the essential elements of the crime under state law when

determining if the evidence was sufficient.  Jackson, 443 U.S. at 324 n.16.  If the OCCA applied the

Jackson standard and denied petitioner's claim as to the sufficiency of the evidence on the merits,

the Court must give deference to the OCCA's decision unless that decision was an unreasonable

application of clearly established federal law.  Diestel v. Hines, 506 F.3d 1249, 1267 (10th Cir.

2007).

Petitioner raised his sufficiency of the evidence claim on direct appeal, and respondent

acknowledges that petitioner's claim is exhausted.  Dkt. # 18, at 71.  However, the OCCA found that

evidence was sufficient to sustain petitioner's conviction under a first degree malice aforethought

or felony murder theory.   The OCCA rejected Banks' argument that the lack of evidence

establishing who actually shot Sun Travis precluded a conviction under a malice aforethought

theory:

> In a light most favorable to the State, the evidence established that Banks and Nelson
> drove in Banks's car to [Sun] Travis's apartment complex.  Upon [Sun] Travis's
> arrival, they forced her into their car, drove to the Apache Manor Apartments, forced
> her into an apartment, vaginally and anally raped her, returned to the car, and drove
> to 36th street where one or the other shot [Sun] Travis in the head.
>
> .     .     .
>
> Banks's admitted presence at the crime scenes is consistent with the evidence.  His
> denials of participation and/or culpability are not.  Banks's DNA was found on
> evidence gathered from the victim's corpse and clothing, establishing his
> participation in forcible rape.  Although the State admits uncertainty over whether
> Banks or Nelson actually shot [Sun] Travis, a jury could have believed that Banks
> had done so-or that he, at a minimum, aided and abetted in the murder-especially

> given that Banks fingered Nelson as the sole sexual partner.  What seems obvious is
> that Travis was killed to conceal her rapists' identities.  Banks was one of the rapists.
> He may or may not have actually pulled the trigger; if he did not, he may
> nevertheless have encouraged Nelson to so.  As such, a rational jury could have
> convicted Banks of malice aforethought murder.

Banks, 43 P.3d at 397.  The OCCA also rejected petitioner's argument that the unreliability of the

DNA evidence prevented the State from obtaining a conviction under a felony murder theory:

> The evidence established that Travis was murdered in the commission of both
> felonies.  Viewing the evidence in a light most favorable to the State, the victim was
> taken forcibly from her parking lot, as indicated by the car lights and misplaced
> driving pillow.  She was then transported to an apartment, where she was forced to
> have intercourse, as established by the bruises and semen on her body and the semen
> found on her clothes.  Upon completion of these crimes, the victim was executed on
> the roadside.  All elements of felony murder in the commission of rape or kidnapping
> were met.  The only question for the jury was who committed the crimes.
>
> Banks was one of the two perpetrators.  He admitted his presence at all relevant
> locations; it was his car that was used to abduct the victim; it was partly his semen
> found on the victim's clothing and his semen alone on the vaginal swab.
>
> Banks argues that the DNA evidence was inaccurate because his brother's DNA was
> not compared to that obtained from [Sun] Travis.  Although the DNA experts agreed
> that a sibling's DNA could skew the statistical results, that observation did not
> change their opinion that Banks' DNA matched that obtained from the victim.
> Banks also claims that his brother's refusal to testify based upon the Fifth
> Amendment supports his brother's possible guilt for these crimes.  The record
> indicates instead that Walter Banks (1) did not want to incriminate his brother and
> (2) did not want to return to his own prison term labeled a "snitch."  Banks benefitted
> from both arguments by allowing the jury to infer that his brother, Walter [Banks],
> could have committed the crimes.  However, neither argument affected the
> sufficiency of the evidence to convict Banks of malice aforethought or felony murder
> in the commission of a kidnapping or forcible rape.  This proposition is denied.

Id. at 397-98.

Petitioner argues that the State's case for malice aforethought murder was based entirely on

circumstantial evidence, and the State failed to prove that petitioner actually killed Sun Travis or

aided and abetted Nelson in committing her murder.  Dkt. # 10, at 86-89.  He also asserts that the

73

OCCA erred by applying the <u>Jackson</u> standard to his insufficiency of the evidence claim, because Oklahoma law permits the OCCA to affirm a murder conviction based on circumstantial evidence only when the circumstantial evidence rules out all reasonable hypothesis except the defendant's guilt. <u>Id.</u> at 88-89. However, respondent is correct that the "reasonable hypothesis" standard does not apply in cases involving direct and circumstantial evidence. <u>See</u> <u>Riley v. State</u>, 760 P.2d 198, 199-200 (Okla. Crim. App. 1988). In his brief on direct appeal, petitioner conceded that the State's case included direct and circumstantial evidence, and the <u>Jackson</u> standard was applicable. Appellant's Brief at 22 n.18, Case no. F-99-1483 (Okla. Crim. App.). Petitioner's argument that the OCCA applied the wrong standard of review to his claim is meritless. The Court has reviewed the evidence presented at trial in a light most favorable to the State, and finds that the OCCA's decision was not an unreasonable application of clearly established federal law. Under Oklahoma law, first degree murder is defined as unlawfully killing another person with malice aforethought. OKLA. STAT. tit. 21, § 701.7. "Premeditated design sufficient to establish malice aforethought may be inferred from the fact of killing alone, unless the facts and circumstances raise a reasonable doubt as to whether such design existed." <u>Hancock v. State</u>, 155 P.3d 796, 812 (Okla. Crim. App. 2007). There is no dispute that petitioner was present when Sun Travis was murdered, and a rational jury could have concluded that petitioner, not Nelson, actually committed the murder. A rational jury also could have found that petitioner aided and abetted Nelson by driving Sun Travis to a remote area with knowledge of Nelson's intent to commit a murder and that he actively assisted Nelson in committing the murder. Although petitioner, in his 1979 police statement, denied committing the murder or knowing of Nelson's intent to commit murder, the jury was not required to believe that

petitioner's self-serving statement accurately reflected the facts of the crime and, at a minimum, the DNA evidence contradicted petitioner's statement.

The OCCA's decision to reject petitioner's claim of insufficiency of the evidence as to felony murder is also entitled to deference under AEDPA. Petitioner argues that there is no evidence that he committed the underlying crimes of kidnapping and forcible rape, and he could not have been convicted of felony murder. Under Oklahoma law, to prove kidnapping, the State was required to prove that petitioner unlawfully seized Sun Travis and secretly confined her against her will and, to prove forcible rape, the State was required to show that Sun Travis was forced to have intercourse by someone other than her spouse. See Banks, 43 P.3d at 397. The circumstantial evidence established that Sun Travis arrived at the parking lot of her apartment complex around 11:00 p.m, but she was abducted before she could enter her apartment. She was followed closely by a car and did not park in her usual parking spot, and the driver's side door was open and the headlights were still on when Steve Travis found the vehicle. Although petitioner's statement to police indicated that Sun Travis was Nelson's girlfriend, the circumstantial evidence strongly suggested that Sun Travis was taken against her will. The evidence also establishes that Sun Travis was taken to the Apache Manor Apartments after being abducted. Thus, a rational jury could have found the essential elements necessary for the underlying felony of kidnapping. A rational jury could also have found that petitioner committed the crime of forcible rape. Petitioner's semen was found on the victim's body, and she had bruises and contusions on her face. The medical examiner testified that this bruising could have not have occurred after Sun Travis' death, and this is circumstantial evidence that any sexual activity was not consensual. Petitioner challenges the reliability of the DNA evidence and argues that the circumstantial evidence does not establish that Sun Travis had sexual

intercourse against her will.  The OCCA addressed and rejected these arguments, and the OCCA's decision was neither contrary to nor an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).  To the extent the OCCA was required to determine the facts applicable to petitioner's claim, the Court also finds that the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented at trial.  28 U.S.C. § 2254(d)(2). Therefore, petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

Ground Nine: Ineffective Assistance of Counsel

Petitioner argues that trial counsel was ineffective for failing to investigate the Walter Banks theory before trial, failing to object to prosecutorial misconduct, and failing to object to improper other crimes evidence.  Dkt. # 10, at 93.  Respondent states that the OCCA considered and rejected each of these arguments, and the OCCA's decision was not an unreasonable application of clearly established federal law.  Dkt. # 18, at 82.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland, 466 U.S. at 687; Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993).  A habeas petitioner can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases.  Strickland, 466 U.S. at 687-88.  There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688.  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Id. at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

omission of counsel was unreasonable." Id. at 689.  To establish the second prong, a habeas petitioner must show that counsel's deficient performance prejudiced the petitioner to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).  To establish prejudice as to the penalty phase in a death penalty case, a habeas petitioner must show that "there is a reasonable probability that one juror would have chosen a sentence other than death." Matthews v. Workman, 577 F.3d 1175, 1190 (10th Cir. 2009).

At trial, petitioner argued that his brother, Walter Banks, participated in the rape and murder of Sun Travis.  Petitioner relied on this theory to explain the DNA found on Sun Travis' body and clothing, and argued that Walter Banks could be the person who left certain DNA on Sun Travis.  However, petitioner had no evidence showing that Walter Banks was present while the crimes were committed and he did not have any evidence showing that the DNA found on Sun Travis matched Walter Banks' DNA profile.  On direct appeal to the OCCA, petitioner argued that trial counsel was ineffective for failing to conduct an adequate investigation to support the Walter Banks theory.  The OCCA rejected this argument and found that trial counsel's conduct was consistent with an apparent trial strategy to discredit the reliability of the DNA testing. Banks, 43 P.3d at 403.  The OCCA also found that petitioner's theory that DNA evidence found on Sun Travis could have belonged to Walter Banks, instead of petitioner, was an "unlikely" explanation of the DNA evidence "given [petitioner's] admitted presence at the crime scenes." Id.  The OCCA also denied petitioner's request for an evidentiary hearing on this claim. Id. at 403 n.43.  Respondent states that petitioner

raised this claim on direct appeal and it was considered on the merits, and no procedural bar applies to this claim.  Dkt. # 18, at 82.

Petitioner claims that "the only piece of evidence inconsistent with the version of events [petitioner] relayed to law enforcement was the DNA testing," and trial counsel's failure to develop the Walter Banks theory in attempt to explain the presence of matching DNA on Sun Travis constituted constitutionally deficient performance.  Dkt. # 10, at 95-96.  He argues that the Walter Banks theory is not inconsistent with his statements to police, because Walter Banks could have been inside the Apache Manor Apartments while petitioner waited in the car. Petitioner argues that the OCCA assumed that trial counsel adopted a particular trial strategy, but that it was error for the OCCA to decide this issue without holding an evidentiary hearing.

The Court finds that the OCCA's decision was not an unreasonable application of clearly established federal law.  While the Walter Banks theory might have explained how DNA matching petitioner's was found on Sun Travis, it is inconsistent with his primary defense at trial and it was an unlikely explanation for the DNA evidence found on Sun Travis' body.  At trial, petitioner relied heavily on the alleged truth of his 1979 statements to police and argued that he was simply a bystander who did not know that Nelson intended to kidnap, rape, and murder Sun Travis. However, his statement does not mention the presence of Walter Banks during the commission of the crimes.  Trial counsel has an obligation to investigate all reasonable leads before making an informed choice that additional investigation was unnecessary or that certain evidence should not be used at trial.  See Hooper v. Mullin, 314 F.3d at 1171.  However, petitioner has not provided any evidentiary basis for his argument that Walter Banks raped Sun Travis, and the Walter Banks theory was inconsistent with petitioner's primary defense at trial.  Even so, trial counsel used cross-

examination of the State's expert witnesses to cast doubt on the reliability of the DNA evidence, and was able to elicit testimony that the existence of a biological sibling could change the statistical likelihood that the DNA found on Sun Travis belonged to petitioner.  Petitioner claims that trial counsel should have obtained a DNA sample from Walter Banks and requested comparative testing of Walter Banks' DNA to the DNA found on Sun Travis.  However, it is not clear that trial counsel could have obtained a DNA sample from Walter Banks or that trial counsel had any basis to believe that this strategy would have been an effective use of trial counsel's limited time for trial preparation.  Trial counsel was clearly aware of the Walter Banks theory and investigated this theory before trial, but there was not a substantial amount of evidence to support this argument.  Thus, the OCCA's determination that trial counsel made a strategic decision to pursue other defenses is supported by the record, and the OCCA's decision was not an unreasonable application of clearly established federal law.

Petitioner argues that trial counsel failed to object to a wide range of alleged prosecutorial misconduct, and trial counsel's deficient performance prejudiced petitioner at trial.  Dkt. # 100, at 99-100.  Petitioner claims that the prosecutor made inflammatory and dehumanizing remarks about petitioner during closing argument, improperly expressed his own opinion about petitioner's guilt, disparaged defense counsel, and improperly invoked sympathy for the victim. Petitioner argues that trial counsel failed to object to the admission of other crimes evidence and petitioner was prejudiced by the implication that he made his 1979 statement to police in an attempt to obtain a plea deal in an unrelated criminal case.  Petitioner raised the same substantive arguments in Grounds Two and Three of his petition for writ of habeas corpus, and the Court has found that petitioner is not entitled to relief on these claims.  See supra at III (Ground Two, Ground Three).  For the same reasons, the

Court finds that trial counsel was not ineffective for failing to object to the allegedly improper statements and/or other crimes evidence at trial.

The OCCA considered and rejected each aspect of petitioner's ineffective assistance of counsel claim, and the OCCA's decision was not contrary to or an unreasonable application of Strickland.  28 U.S.C. § 2254(d)(1).  Thus, petitioner's ineffective assistance of counsel claim should be denied.

Ground Ten: Insufficient Evidence to Support Murder to Avoid Arrest Aggravating Circumstance

Petitioner claims that the State failed to present sufficient evidence showing that Sun Travis was murdered for the purpose of avoiding or preventing arrest, and this aggravating circumstance was not proven beyond a reasonable doubt.  Dkt. # 10, at 102-05.  Respondent argues that the OCCA considered and rejected this argument, and the OCCA's finding is entitled to deference under AEDPA.  Dkt. # 18, at 91-94.

To establish the aggravating circumstance that a murder was committed to avoid arrest or prosecution, the State must prove beyond a reasonable doubt that the defendant committed "a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution."  Romano v. State, 909 P.2d 92, 119 (Okla. Crim. App. 1995). The State must also show that the defendant committed a murder with the intent to avoid arrest or prosecution.  Id.  The State can make this showing using circumstantial evidence, but the circumstantial evidence must "rule out all other reasonable hypotheses."  Snow v. State, 876 P.2d 291, 299 (Okla. Crim. App. 1994).  When reviewing a state court's application of a constitutionally adequate aggravating factor, the Court must apply the "rational factfinder" standard established in Jackson v. Virginia, 443 U.S. 307 (1979).  Fields v. Gibson, 277 F.3d 1203, 1220 (10th Cir. 2002).  Under this standard, the Court

80

"asks 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the [presence of the aggravating circumstance] beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 324.

During its second stage closing argument, the State argued that defendant kidnapped Sun Travis and raped her, and she "was executed so nobody could identify her." Tr. Trans. at 1084. The State presented evidence that petitioner killed Fremin and told his ex-wife that "dead men tell no tales," implying that Fremin was killed to avoid arrest or prosecution. Id. at 1104. The State argued that Sun Travis was murdered for the same reason, because she would be able to identify petitioner and Nelson following her abduction and rape. The jury unanimously found that defendant murdered Sun Travis to avoid arrest or prosecution. Id. at 1118. The OCCA stated that it reviewed the evidence for this aggravating circumstance apart from the evidence for petitioner's underlying murder conviction and it gave "consideration . . . to the circumstantial evidence to determine if 'any reasonable hypothesis exists other than the defendant's intent to commit the predicate crime.'" Banks, 43 P.3d at 400. The OCCA found that the evidence was sufficient to support this aggravating circumstance:

> Here, the evidence indicated that [Sun Travis] was raped and kidnapped, that both [petitioner] and Nelson committed these crimes, and at least intended her death. Further, the only reasonable hypothesis for [Sun Travis'] murder was that it was done to prevent her from identifying her assailants and instigating their arrest or prosecution for kidnapping and rape. The evidence was sufficient, and this Proposition is denied.

Id. Respondent acknowledges that petitioner has exhausted this claim and it is properly before the Court. Dkt. # 18, at 91.

The Court finds that the OCCA did not unreasonably apply clearly established federal law when it rejected petitioner's claim that the evidence was insufficient to prove the "avoid arrest or

81

prosecution" aggravating circumstance, and petitioner is not entitled to habeas relief.  The OCCA found that the only reasonable hypothesis to explain Sun Travis' murder was that she was murdered to prevent identification of her assailants.  Banks, 43 P.3d at 400.  The evidence presented at trial showed that petitioner was present when Sun Travis was kidnapped.  He argued that Sun Travis voluntarily entered his car, but the circumstantial evidence produced by the State refuted this argument.  The State also produced DNA evidence establishing that petitioner's DNA was on Sun Travis' clothing and body.  Petitioner claims that the circumstantial evidence does not rule out the possibility that his 1979 statement to police was accurate, and a reasonable factfinder could have found that Nelson, rather than petitioner, intended to murder Sun Travis to avoid arrest or prosecution.  However, petitioner does not account for the DNA evidence, and offers no explanation of how his DNA was found on Sun Travis.  A rational factfinder could have determined beyond a reasonable doubt that petitioner killed or participated in Sun Travis's murder with the purpose of avoiding arrest or prosecution on kidnapping and rape charges.  Therefore, the OCCA's decision was not contrary to or an unreasonable application of clearly established federal law and petitioner is not entitled to relief.  28 U.S.C. § 2254(d)(1).

Ground Eleven: Insufficient Evidence to Support the Especially Heinous, Atrocious, or Cruel Aggravating Circumstance

Petitioner argues that the State failed to prove beyond a reasonable doubt that the murder in this case was especially heinous, atrocious, or cruel, and the imposition of this aggravating circumstance violated petitioner's constitutional rights.  Dkt. # 10, at 105.  He claims that Sun Travis was killed with a gunshot to the head, and the brief period of conscious pain and suffering that accompanies such murders is generally insufficient to support this aggravating circumstance.

82

Respondent asserts that the OCCA considered and rejected this argument, and the OCCA's decision is entitled to deference. Dkt. # 18, at 95.

During the second stage of trial, the prosecution argued that the murder was especially heinous or cruel considering the events leading up to the murder, and did not argue that the act of murder itself supported this aggravating circumstance. The State relied on circumstantial evidence suggesting that Sun Travis was kidnapped and taken to the Apache Manor Apartments. The State produced DNA evidence showing at least two men had sex with Sun Travis, and bruising on Sun Travis' body refuted petitioner's claim that the sex was consensual. The State argued that Sun Travis was held for up to two hours and vaginally and anally raped. The evidence did not rule out the possibility that both men simultaneously raped Sun Travis. After raping Sun Travis, the evidence showed that Nelson and petitioner placed Sun Travis in petitioner's car and drove to a sparsely-populated area in north Tulsa. The State argued that Nelson or petitioner removed Sun Travis from the car and took her to a nearby field, and shot her in the head at close range. The OCCA found that the State presented sufficient evidence to establish the especially heinous, atrocious, or cruel aggravating circumstance beyond a reasonable doubt:

> In Proposition XV, [petitioner] alleges that the trial court erred in overruling his Motion to Strike the "heinous, atrocious and cruel" aggravating circumstance for insufficient evidence, and that the trial evidence failed to support the jury's finding that it existed. We review the evidence presented at trial in a light most favorable to the State to determine if the victim's death was preceded by conscious physical abuse or torture.

> The trial judge correctly overruled the motion and determined that the evidence was sufficient. While conscious and before her execution, Sun Travis was kidnapped, physically assaulted, and raped and sodomized by [petitioner] and Nelson. Her ordeal lasted over two hours. Such evidence was sufficient to prove extreme mental and physical abuse and torture. Thus, we find that the evidence supported the jury's finding of the "heinous, atrocious and cruel" aggravating circumstance. This Proposition is denied.

Banks, 43 P.3d at 400-01.  Respondent states that petitioner challenged the use of the aggravating circumstance on direct appeal, and petitioner's claim, as asserted before the OCCA, is exhausted. Dkt. # 18, at 95.  However, respondent asserts that petitioner did not contest the jury instructions on direct appeal, and this aspect of petitioner's claim is procedurally barred.  Id. at 100.

The Supreme Court has reviewed the constitutionality of Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance, and has made it clear that not every murder falls under this description.  Maynard v. Cartwright, 486 U.S. 356 (1988) (finding that the "especially heinous, atrocious, or cruel" aggravating circumstance unconstitutional under the Due Process Clause of the Fourteenth Amendment, because it was unconstitutionally vague and failed to limit the factfinder's discretion).  The State has refined this aggravating circumstance to correct the problems found in Maynard, and the Tenth Circuit has determined that this aggravating circumstance is not facially unconstitutional.  Romano v. Gibson, 239 F.3d 1156 (10th Cir. 2001); Moore v. Gibson, 195 F.3d 1152, 1175-76 (10th Cir. 1999).  However, the "especially heinous, atrocious, or cruel" aggravating circumstance is susceptible to as-applied challenges if the evidence at trial fails to establish this aggravating circumstance beyond a reasonable doubt.  Thomas v. Gibson, 218 F.3d 1213, 1226-27 (10th Cir. 2000).

The State may prove the especially heinous, atrocious, or cruel aggravating circumstance with evidence of "conscious physical abuse or torture prior to death," and this requires the State to produce evidence that the victim was "conscious and aware of the attack."  Black v. State, 21 P.3d 1047, 1074 (Okla. Crim. App. 2001).  This aggravating circumstance is also appropriate if the victim suffered "extreme mental cruelty" before her death.  Gilson v. State, 8 P.3d 883, 924 (Okla. Crim. App. 2000). The factfinder should consider the events leading up to the murder to determine if the victim suffered

84

either great physical anguish or extreme mental cruelty and, after making this determination, may also consider "the attitude of the killer and the pitiless nature of the crime."  Id.

In addition to the argument raised on direct appeal, petitioner argues that the trial judge failed to instruct the jury about the "conscious suffering" prerequisite, and the jury could not have found beyond a reasonable doubt that the State met its evidentiary burden on this issue. Dkt. # 10, at 107. Respondent argues that petitioner did not raise any issue as to the jury instructions on direct appeal, and this aspect of petitioner's claim is subject to an anticipatory procedural bar.  Dkt. # 18, at 100. An "'[a]nticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." Anderson v. Sirmons, 476 F.3d 1131, 1140 n. 7 (10th Cir.2007) (quoting Moore v. Schoeman, 288 F.3d 1231, 1233 n. 3 (10th Cir.2002)).  To overcome the anticipatory procedural bar applicable to a habeas claim which was omitted on direct appeal or a motion for post-conviction relief, petitioner must demonstrate either "cause and prejudice" or a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Maes, 46 F.3d at 985.

The Court has reviewed petitioner's briefing on direct appeal and his initial application for post-conviction relief, and he did not assert any alleged error concerning the jury instructions in the penalty phase.  Petitioner argues that he can overcome the procedural bar by establishing cause and prejudice or a miscarriage of justice, and reasserts the same arguments used in an attempt to overcome the procedural bar of Ground Five of his habeas petition. Dkt. # 29, at 52. The Court has already found that petitioner's arguments are inadequate to overcome the procedural bar, and any argument concerning defective jury instructions is barred by petitioner's failure to present this issue to the OCCA.  See supra at III (Ground Five).  However, this does not bar consideration of

petitioner's claim that the State failed to present sufficient evidence to prove the "especially heinous, atrocious and cruel" aggravating circumstance, and this aspect of petitioner's claim is properly before the Court.

The Court has reviewed petitioner's argument and finds that a rational factfinder could have concluded that Sun Travis suffered great physical anguish or extreme mental cruelty before she was killed, and petitioner is not entitled to habeas relief.  Viewing the evidence in a light most favorable to the State, the evidence establishes that Sun Travis was kidnapped from apartment around 11 p.m. on June 6, 1979 by petitioner and Nelson.  Petitioner and Nelson took her to the Apache Manor Apartments and raped her for up to two hours.  Bruises on Sun Travis' body show that she suffered some physical abuse before she died.  After raping Sun Travis, petitioner and Nelson put Sun Travis in petitioner's vehicle and drove along 36th Street North in Tulsa.  Petitioner stopped the vehicle and one or both men led Sun Travis about 15 feet from the site of road.  Petitioner or Nelson shot Sun Travis in the head at close range.  There is no evidence that Sun Travis was unconscious at any time before she was killed.  Petitioner argues that death by gunshot to the head would have been instantaneous and she would not have suffered physical or emotional distress.  However, he ignores the series of events leading up to Sun Travis' death, and a rational factfinder could have found that Sun Travis suffered conscious physical abuse or torture and/or mental anguish before her death.  The OCCA's decision to reject petitioner's challenge to the use of this aggravating circumstance was not contrary to or an unreasonable application of clearly established federal law, and the OCCA's decision is entitled to deference under 28 U.S.C. § 2254(d)(1).  Petitioner's claim concerning the application of the "especially heinous, atrocious and cruel" should be denied.

Ground Twelve: Cumulative Error

Petitioner asks the Court to review all alleged constitutional errors during these proceedings, and claims that the cumulative effect of these errors deprived him of a fair trial. Dkt. # 10, at 111. In particular, he alleges that the State's questioning of Walter Banks and the prosecutor's comments on petitioner's silence  violated his constitutional rights, and his trial was rendered fundamentally unfair by the cumulative effect of these errors. Dkt. # 18, at 103.

Petitioner raised the issue of cumulative error on direct appeal to the OCCA, and argued that all of the errors alleged in his appellate brief should be considered. The OCCA reviewed all of petitioner's argument and found that he had identified two harmless errors on direct appeal: (1) the State's improper questioning of Walter Banks; and (2) the prosecutor's comments on petitioner's right to remain silent. Banks, 43 P.3d at 403. The OCCA rejected petitioner's cumulative error claim, and found that the constitutional errors did not "require relief, either individually or in the aggregate." Id. Respondent states that petitioner raised this claim on direct appeal and in his initial motion for post-conviction relief and the OCCA denied relief on the merits, and this claim is properly before the Court. Dkt. # 18, at 103.

When conducting a cumulative error analysis, the Court must consider all constitutional errors found to be harmless and determine if the "cumulative effect of the outcome of the trial is such that collectively they can no longer be determined to be harmless." Alverson, 595 F.3d at 1162 (quoting Brown v. Sirmons, 515 F.3d 1072 (10th Cir. 2008)). "The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." Young v. Sirmons, 551 F.3d 942, 972 (10th Cir. 2008) (quoting Jackson v. Johnson, 194 F.3d 641 655 n.59 (5th Cir. 1999)). If the OCCA considered

petitioners' claim of cumulative error and this Court has found no additional constitutional error, the OCCA's decision is entitled to deference under AEDPA. Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003). However, if the OCCA did not consider the constitutional errors identified by this Court, there is no state court decision to review and this Court must apply pre-AEDPA standards when considering petitioner's claim. Id.

The OCCA's denial of petitioner's cumulative error claim was not contrary to or an unreasonable application of clearly established federal law, and petitioner is not entitled to relief on this claim. 28 U.S.C. § 2254(d)(1). This Court has reviewed the two constitutional errors established by petitioner, and finds that the errors were harmless, whether considered individually or cumulatively. The State did not build its case based on improper inferences from Walter Banks' non-testimony, and the trial judge quickly instructed the jury to disregard any comments on petitioner's right to remain silent. Given the substantial evidence of petitioner's guilt, this Court finds that these errors did not render petitioner's trial fundamentally unfair. Le v. Mullin, 311 F.3d 1002, 1023 (10th Cir. 2002) (considering the weight of the evidence of petitioner's guilt as a factor in denying relief based on alleged cumulative error).

Ground Thirteen: Method of Execution

Petitioner filed an amendment to his petition for writ of habeas corpus (Dkt. # 13) asserting a claim that Oklahoma's method of execution, lethal injection, violates the Eighth Amendment. Respondent argues that petitioner did not exhaust this claim in state court or, in the alternative, the petitioner's claim is premature until an execution date has been set. Petitioner acknowledges that the Court may not reach the merits of this claim, but states that he has raised this claim to preserve his right to challenge the method of execution employed by the State. Dkt. # 13, at 2-3 ("[Petitioner]

88

desires to pursue the matter under [42 U.S.C.] § 1983 but presents the present claim to assure that it will not be waived should the Tenth Circuit decide, as at least one Circuit Court has apparently done, that all method of execution challenges must be characterized as habeas corpus actions."). The Tenth Circuit has not decided whether challenges to the method of execution should be brought under § 1983 or as part of a habeas corpus action, but has suggested that § 1983 is the more appropriate vehicle to raise this type of claim. Duty v. Workman, 366 Fed. Appx. 863, 878 (10th Cir. 2010). If the claim is raised in a petition for writ of habeas corpus, a federal court may not address the claim unless the petitioner has exhausted the claim in state court. Id. at 878-79. Petitioner did not raise this claim on direct appeal or in his initial motion for post-conviction relief. The OCCA would find that this claim is procedurally barred, and the Court may not review petitioner's claim unless he can establish cause and prejudice or a miscarriage of justice to excuse the procedural default. See Thomas, 218 F.3d at 1221 ("the Supreme Court has held that if a petitioner 'failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief"). Petitioner incorporates the same arguments asserted in connection with the procedural default of Ground Five, and the Court has previously rejected those arguments as a basis to excuse petitioner procedural default. See supra at III (Ground Five). Petitioner argues that respondent has offered a "Hobson's choice" that essentially precludes any person from challenging the method of execution in Oklahoma, because the OCCA will not consider the claim on direct appeal but he is also barred from pursuing this claim in a federal habeas petition. However, as petitioner acknowledges, the preferred manner

to assert this claim is under § 1983, and he has another avenue to challenge the constitutionality of Oklahoma's lethal injection procedure.[17]

**IT IS THEREFORE ORDERED** that Randall G. Workman is substituted for Mike Mullin as the party respondent and the **Court Clerk is directed** to note such substitution on the record.

**IT IS FURTHER ORDERED** that petitioner Anthony Rozelle Banks's Petition for a Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (Dkt. ## 10, 13) is **denied**. A separate judgment is entered herewith.

**DATED** this 3rd day of September, 2010.

_Claire V Eagl_

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[17]     The Court notes that the Tenth Circuit has found that Oklahoma's lethal injection procedure does not violate the Eighth Amendment, and Oklahoma has addressed risks that have arisen in executions in other states to prevent unnecessary pain and suffering during an execution. Hamilton v. Jones, 472 F.3d 814 (10th Cir. 2007).